**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Hon. Esther Salas** |
| | : | |
| **v.** | : | **Crim. No. 24-836** |
| | : | **Crim. No. 24-837** |
| **AVIN INTERNATIONAL LTD and KRITI RUBY SPECIAL MARITIME ENTERPRISE** | : : : | |

**PLEA AGREEMENT**

The United States of America, by and through the United States Attorneys for the District of New Jersey and the Middle District of Florida, and the Environmental Crimes Section of the U.S. Department of Justice (collectively referred to herein as the "Government" or the "United States"), and Defendants Avin International Ltd and Kriti Ruby Special Maritime Enterprise (collectively referred to herein as "Defendants"), by and through their authorized representatives, enter into the following Plea Agreement pursuant to Rule 11(c)(1)(C) and Rule 11(c)(3) of the Federal Rules of Criminal Procedure:

1. Waiver of Indictment and Criminal Charges. Defendants, having been advised through their counsel of the right to be charged by Indictment, agree to waive that right and enter a plea of guilty to the charges brought by the Government in Criminal Informations filed in the District of New Jersey and the Middle District of Florida as set forth below. Upon the filing of the Criminal

Informations in the District of New Jersey and Middle District of Florida, the Government and Defendants agree to jointly seek the transfer of the Criminal Information filed in the Middle District of Florida, pursuant to the provisions of Rule 20 of the Federal Rules of Criminal Procedure, to the District of New Jersey for entry of the guilty pleas and sentencing in that district. The pleas of guilty in the District of New Jersey are to be entered by Defendants' counsel, who is authorized by a resolution of each Defendant's Board of Directors to enter pleas of guilty on each Defendant's behalf. By entering these guilty pleas, Defendants hereby waive all objections to the form of the charging documents and admit that they are in fact guilty of the offenses as set forth in the Criminal Informations and that the attached Joint Factual Statement (Attachment 1), dated this same day, is an accurate statement of their conduct. Defendants agree to enter pleas of guilty to the following charges:

A. District of New Jersey

Defendants will plead guilty to the following counts in the District of New Jersey relating to the *Motor Tanker Kriti Ruby* (hereinafter, "*M/T Kriti Ruby*"):

> Count One: The Act to Prevent Pollution from Ships. Knowing failure to maintain an accurate Oil Record Book for the *M/T Kriti Ruby* in which all overboard discharges and disposals otherwise of oil, oily mixtures, oil residue, and bilge water that accumulated in the machinery spaces of the *M/T Kriti Ruby*, were fully recorded, in violation of 33 U.S.C. § 1908(a) and 33 C.F.R. § 151.25.

> Count Two: Falsification of Records. Knowingly concealing and falsifying, and making false entries in, records and documents with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the United States Coast Guard, a component of the United State Department of Homeland Security, and in relation to and in contemplation of such matter, in violation of 18 U.S.C. § 1519.
>
> Count Three: Obstruction of Proceedings. Corruptly influencing, obstructing, and impeding, and endeavoring to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding is being had before the United States Coast Guard, a component of the United States Department of Homeland Security, in violation of 18 U.S.C. § 1505.

B. Middle District of Florida

Defendants will plead guilty to the following count in the Middle District of Florida relating to the *M/T Kriti Ruby*:

> The Act to Prevent Pollution from Ships. Knowing failure to maintain an accurate Oil Record Book for the *M/T Kriti Ruby* in which all overboard discharges and disposals otherwise of oil, oily mixtures, oil residue, and bilge water that accumulated in the machinery spaces of the *M/T Kriti Ruby*, were fully recorded, in violation of 33 U.S.C. § 1908(a) and 33 C.F.R. § 151.25.

2. The Penalties. Defendants understand that the statutory penalties applicable to each felony count to which they are entering pleas of guilty are as follows: a maximum fine of either $500,000 dollars, or twice the gross pecuniary gain or loss resulting from the unlawful conduct, pursuant to 18 U.S.C. § 3571(c) and (d), a term of probation of five years, pursuant to 18 U.S.C. § 3561(c)(1), and a special assessment of $400 per count, pursuant to 18 U.S.C. § 3013(a)(2)(B). Defendants understand that, in addition to any other penalty, the Court may order

the payment of restitution to any victim of the offenses pursuant to the provisions of 18 U.S.C. § 3663. The parties agree that they are not aware of any factual basis that would support a finding that restitution is warranted in this case.

3. Rights Waived by Pleading Guilty. Through their authorized representatives, Defendants knowingly and voluntarily waive the following rights through their guilty pleas: (a) the right to plead not guilty, and to persist in a plea of not guilty; (b) the right to a speedy and public trial before a jury; (c) the right to the effective assistance of counsel at trial; (d) the right to be presumed innocent until guilt has been established at trial, beyond a reasonable doubt; (e) the right to confront and cross-examine witnesses at trial; (f) the right to compel or subpoena witnesses to appear on Defendants' behalf at trial; (g) the right to testify; and (h) the right to appeal a finding of guilt or any pretrial rulings.

4. Applicability of Sentencing Guidelines. Defendants understand and acknowledge that, at sentencing, the Court is required to consider the United States Sentencing Guidelines (the "U.S.S.G."), together with the other sentencing goals set forth in 18 U.S.C. § 3553(a). Defendants understand and acknowledge that the U.S.S.G., including Chapter Eight that provides guidance for the sentencing of corporate defendants, may be considered by the Court, except that pursuant to U.S.S.G. §§ 8C2.1 and 8C2.10, the provisions of U.S.S.G. §§ 8C2.2 through 8C2.9, pertaining to determining the fine range for corporate defendants, do not apply in cases involving environmental or obstruction crimes. Instead, the fine is to be

determined under 18 U.S.C. §§ 3553 and 3571. The parties stipulate that there is a sufficient factual basis to support a fine under 18 U.S.C. § 3571(c). All other sections of Chapter Eight of the Sentencing Guidelines that are applicable to corporate defendants are applicable to this case, including provisions for probation and community service.

5. Sentencing Agreement. Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and 18 U.S.C. § 3571(d), in return for the complete fulfillment by Defendants of all of their obligations under this Plea Agreement, the Government and Defendants agree that the sentence to be imposed by the Court includes a total monetary penalty consisting of $4,500,000 plus the mandatory special assessments discussed herein. The parties agree that the sentence should be imposed as follows:

a. Criminal Fine. Defendants shall pay $3,375,000 of the total monetary penalty as a criminal fine. The specific special penalty apportionments are set forth in Paragraph 6, below.

b. Mandatory Special Assessment. Defendants shall pay a special assessment of $400 for each count of conviction. The total amount of special assessments is $1,600.

c. Community Service. $1,125,000 of the total monetary penalty shall be paid as organizational community service pursuant to U.S.S.G. § 8B1.3, and in furtherance of satisfying the sentencing principles provided for

under 18 U.S.C. § 3553(a). The parties have agreed that the community service payments will be made to the National Fish and Wildlife Foundation ("NFWF") and should be used as set forth below:

(1) NFWF is a nonprofit organization established by the United States Congress pursuant to 16 U.S.C. §§ 3701-3710. NFWF's purposes include the acceptance and administration of "property . . . to further the conservation and management of fish, wildlife, plants, and other natural resources," and the performance of "such other activities as will further the conservation and management of the fish, wildlife, and plant resources of the United States, and its territories and possessions for present and future generations of Americans." 16 U.S.C. § 3701(b)(1), (2). NFWF is empowered to "do any and all acts necessary and proper to carry out" these purposes, including, specifically, solicitation, acceptance, administration, and use of "any gift, devise or bequest . . . of real or personal property." 16 U.S.C. § 3701(c)(1). NFWF's Congressional charter mandates that it be governed by a Board of Directors that includes the Director of the United States Fish and Wildlife Service, the Under Secretary of Commerce for Oceans and Atmosphere, and various individuals educated or experienced in fish, wildlife, ocean, coastal, or other natural resource conservation. 16 U.S.C. § 3702(b)(1), (2). NFWF is also required by its charter to submit to Congress annually a report of its proceedings and activities during such year, including a full and complete statement of its receipts, expenditures, and investments. 16 U.S.C. § 3706(a), (b).

(2) The overall purpose of the community service payment is to provide for maritime ecological restoration projects in the District of New Jersey and the Middle District of Florida. NFWF shall use the community service payment by Defendants to fund only projects that support this purpose.

D. Payments. Defendants further agree that if the terms of this Rule 11(c)(1)(C) Plea Agreement are accepted by the Court, that the fine and special assessments shall each be paid on the date of sentencing, with payment to be made in the form of a check payable to the "United States District Court Clerk." Defendants further agree that, if the terms of this Plea Agreement are accepted by the Court, the community service payment shall be paid in full directly to NFWF within 48 hours of sentencing. Moreover, within 24 hours of making the community service payment, Defendants shall provide confirmation of the payment in writing to the United States, the United States Probation Office for the District of New Jersey, and the Clerk of the United States District Court for the District of New Jersey. Because the community service payments are designated as a criminal payment by an organization, Defendants further agree that they will not seek any reduction in their tax obligations as a result of these community service payments. In addition, because the payment constitutes community service as part of Defendants' guilty pleas, neither Defendant nor any related entity or agent will characterize, publicize, or refer to the community service payments as voluntary donations or contributions.

e. Probation. Defendants will be placed on organizational probation for a period of five years from the date of sentencing, pursuant to 18 U.S.C. § 3561(c)(1) and U.S.S.G. §§ 8D1.1 and 8D1.2. The terms of probation shall include the following specific provisions, in addition to the Court's standard conditions:

(1) No Further Violations. Defendants agree that they shall commit no further violations of the International Convention for the Prevention of Pollution from Ships, as amended (hereinafter, "MARPOL"), federal, state, or local law, and, when operating within the jurisdiction of the United States, shall conduct all their operations in accordance with the laws of the United States. If Defendants learn of any such violations committed by its agents or employees during the term of probation, Defendants shall notify the United States of the violations in accordance with the terms of the Environmental Compliance Plan.

(2) Payments. Payment in full of the monetary amounts set forth herein including all special assessments, fines and restitution, and community service.

(3) Environmental Compliance Plan. Defendants agree to develop, adopt, establish, implement and fund the environmental remedial measures set forth in the Environmental Compliance Plan ("ECP"), attached hereto as Attachment 2, during their terms of probation, consistent with sentencing policies set forth in U.S.S.G. § 8D1.4. As set forth in Attachment 2, Defendants have

agreed to retain the services of an outside independent Third Party Auditor to perform external audits and to fund a Court Appointed Monitor to perform the duties set forth in the ECP and to report to the Court and the United States Probation Office.

6. Imposition and Allocation of the Fine, Special Assessment, and Community Service. Defendants shall pay the following amounts relating to the violations in each of the identified districts:

A. District of New Jersey

Defendants shall pay a total monetary penalty in the amount of $3,375,000 for the offenses charged in the District of New Jersey.

(1) $2,531,250 of the total monetary payment will be designated as a criminal fine, apportioned equally among the counts.

(2) $843,750 of the total monetary penalty will be designated as a community service payment.

(3) Pursuant to 18 U.S.C. § 3013(a)(2)(B), Defendants shall pay a total mandatory assessment of $400 for each count, or a total of $1,200.

B. Middle District of Florida

Defendants shall pay a total monetary penalty in the amount of $1,125,000 for the offense charged in the Middle District of Florida.

(1) $843,750 of the total monetary payment will be designated as a criminal fine.

(2) $281,250 of the total monetary penalty will be designated as a community service payment.

(3) Pursuant to 18 U.S.C. § 3013(a)(2)(B), Defendants shall pay a total mandatory assessment of $400.

7. Application of the Agreement. This Plea Agreement shall bind Defendants and their successors and assigns and parent corporations. Defendants or their successors-in-interest, if applicable, shall provide each undersigned prosecuting office and the United States Probation Office for the District of New Jersey with immediate notice of any name change, corporate reorganization, sale or purchase of vessels subject to the ECP, signing or termination of ship management contracts, or similar action affecting this Plea Agreement and the ECP, pursuant to the notification provisions set forth in the ECP. No change in name, change in corporate or individual control, corporate reorganization, change in ownership, merger, change of legal status, sale or purchase of vessels, or similar action shall alter Defendants' responsibilities under this Plea Agreement. Defendants shall not engage in any action to seek to avoid the obligations and conditions set forth in this Plea Agreement.

8. Cooperation. As part of this Plea Agreement, Defendants agree that they will provide full and complete cooperation in any further investigation or prosecution of individuals in connection with potential violations of MARPOL, the

Act to Prevent Pollution from Ships, false statements, and related acts of obstruction involving the *M/T Kriti Ruby*.

9. Statements. This Plea Agreement does not limit the right of Defendants or the United States to speak at the time of sentencing consistent with the provisions set forth in this Plea Agreement and the Joint Factual Statement, and to provide the Court and the United States Probation Office with evidence of all relevant conduct committed by Defendants. The parties agree that at sentencing each will support the agreed disposition set forth in this Plea Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. Defendants will not make any contrary public statements regarding this Plea Agreement or the attachments hereto.

10. Non-Prosecution of Additional Offenses. Provided that Defendants comply fully with the terms of this Plea Agreement, the U.S. Attorney's Offices for the District of New Jersey, and the Middle District of Florida, and the Environmental Crimes Section of the U.S. Department of Justice, agree to forgo additional criminal prosecution against Defendants in the District of New Jersey and the Middle District of Florida for any additional environmental offenses, or related offenses, involving the *M/T Kriti Ruby*, including but not limited to, falsification of Oil Record Books or violations of the Act to Prevent Pollution from Ships occurring before the date of this Plea Agreement and which are known to the United States at the time of signing this Plea Agreement. Defendants understand

and agree that neither this paragraph nor this Plea Agreement limit the prosecuting authority of any other sections or divisions of the U.S. Department of Justice, including the United States Attorney of any judicial district not a party to this Plea Agreement, or any other federal, state, or local regulatory or prosecuting authorities. Furthermore, this Plea Agreement does not provide or promise any waiver of any civil or administrative actions, sanctions, or penalties that may apply, including but not limited to: fines, penalties, claims for damages to natural resources, suspension, debarment, listing to restrict rights and opportunities of Defendants to contract with or receive assistance, loans, and benefits from United States agencies, licensing, injunctive relief, or remedial action to comply with any applicable regulatory requirement. This Plea Agreement has no effect on any proceedings against any party not expressly mentioned herein, including the actual or potential criminal liability of any individuals.

11. Breach of the Agreement. If the United States determines that either Defendant has failed to comply with any provision of this Plea Agreement, or has committed any crime within the jurisdiction of the United States during the pendency of this Plea Agreement, the United States may, at its sole option, be released from its commitments under this Plea Agreement in their entirety by notifying Defendants, through counsel or otherwise, in writing. The United States may also pursue all remedies available under the law, irrespective of whether it elects to be released from its commitments under this Plea Agreement. Defendants

recognize that no such breach by them of any obligation under this Plea Agreement shall give rise to grounds for withdrawal of their guilty pleas. Defendants understand that should any such breach of this Plea Agreement occur, the United States will have the right to use against Defendants before any grand jury, at any trial, hearing or for sentencing purposes, any statements made by Defendants' employees and agents, and any information, materials, documents or objects provided by Defendants to the United States pursuant to this Plea Agreement without any limitation. In this regard, Defendants hereby waive any defense to any charges which they might otherwise have under any statute of limitations, pre-indictment delay, or the Speedy Trial Act for 120 days following any breach of the Plea Agreement, except to the extent that such defenses existed as of the date of the signing of this Plea Agreement.

12. Probation Office Not Bound By Agreement. Defendants understand that the sentencing disposition agreed upon by the parties is not binding upon the United States Probation Office for the District of New Jersey. Accordingly, if acceptable to the Court, the Parties agree to waive the presentence investigation and report pursuant to Federal Rule of Criminal Procedure 32(c), and to request that the Defendants be sentenced at the time the guilty pleas are entered.

13. Information For Probation Office. Defendants agree to provide all available information requested by the United States Probation Office for the District of New Jersey.

14. Withdrawal of Plea Agreement. Defendants' pleas will be tendered pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. If the sentencing judge rejects this Plea Agreement, then it shall be null and void at the option of either the Government or Defendants. In this regard, Defendants hereby waive any defense to any charges which they might otherwise have under any statute of limitations, pre-indictment delay, or the Speedy Trial Act for 120 days following any nullification or voiding of the Plea Agreement, except to the extent that such defenses existed as of the date of the signing of this Plea Agreement.

15. Corporate Authorization. Defendants represent that they are authorized to enter into this Plea Agreement and to bind themselves and any subsidiaries to the terms of the ECP. At the time of submission of this Plea Agreement to the Court, Defendants shall provide to the Court and the United States a written statement in the form of notarized legal documents certifying that Defendants are authorized to enter into and comply with all of the provisions of this Plea Agreement. The resolutions further shall certify that each Defendant's Board of Directors has authorized these actions, and that all corporate formalities for such authorizations have been observed.

16. Payments to Whistleblower(s). Defendants agree not to take any position, or cause another to take any position, or ask another to submit a position as an amicus curie, on any Government motion which may be filed for payment of

fine money, pursuant to 33 U.S.C. § 1908(a) to the person(s) who provided information leading to the imposition of the criminal penalties in this case.

17. Waiver of Appeal. Defendants, through their authorized representatives, are aware that 18 U.S.C. § 3742 gives them the right to appeal the sentence to be imposed, and that other federal statutes give a defendant the right to appeal other aspects of a conviction. In consideration of the Plea Agreement with the United States as set forth herein, Defendants knowingly and voluntarily agree to waive the following rights: (a) the right, conferred by 18 U.S.C. § 3742, to appeal the sentences imposed by the Court for the convictions of the offenses, including fine and community service payment; (b) the right to appeal any aspect of Defendants' convictions; and (c) the right to bring any collateral attack, or any other writ or motion, that challenges Defendants' convictions or sentences. No provision of this Plea Agreement shall preclude Defendants from pursuing in an appropriate forum, when permitted by law, an appeal, collateral attack, writ, or motion, claiming that Defendants received constitutionally ineffective assistance of counsel.

18. Voluntariness of the Plea. Defendants, through their authorized representatives, acknowledge that they have entered into this Plea Agreement freely and voluntarily and that they have been fully advised by counsel, and that no threats or promises were made to induce Defendants to enter into the guilty pleas called for by this Plea Agreement.

19. Statute of Limitations. In the event that this Plea Agreement is not accepted by the Court for any reason, or Defendants have breached any of the terms of this Plea Agreement, the statute of limitations shall be deemed to have been tolled from the date of the Plea Agreement to: (1) 120 days following the date of non-acceptance of the Plea Agreement by the Court; or (2) 120 days following the date on which a breach of the Plea Agreement by the either Defendant is discovered by the United States.

20. Completeness of Agreement. The United States and Defendants acknowledge that these terms constitute the entire Plea Agreement between the parties. No promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement. This Plea Agreement supersedes all prior understandings, whether written or oral. This Plea Agreement cannot be modified other than in a written memorandum signed by the parties or on the record in Court. This Plea Agreement is effective upon signature by Defendants and all of the attorneys for the United States.

AGREED AND ACCEPTED

TODD KIM
ASSISTANT ATTORNEY GENERAL
ENVIRONMENT & NATURAL RESOURCES DIVISION
U.S. DEPARTMENT OF JUSTICE

By: ______________________
Lauren D. Steele
Trial Attorney

______________________
Kenneth E. Nelson
Senior Trial Attorney

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
DISTRICT OF NEW JERSEY

______________________
Joseph Stern
Assistant United States Attorney

______________________
Katherine E. Ward
Special Assistant United States Attorney

APPROVED:

______________________
David Walk
Deputy Chief
Criminal Division

ROGER B. HANDBERG
UNITED STATES ATTORNEY
MIDDLE DISTRICT OF FLORIDA

By: ______________________
John Cannizzaro
Assistant United States Attorney
Middle District of Florida

On behalf of Defendant Avin International Ltd, I have been authorized by a corporate resolution to sign this Plea Agreement and bind Avin International Ltd. Avin International Ltd has been advised by its attorneys of its rights, of possible defenses, of the applicable Sentencing Guidelines provisions, and of the consequences of entering into this Plea Agreement. Avin International Ltd voluntarily agrees to all of the terms of this Plea Agreement. No promises or inducements have been made to Avin International Ltd other than those contained in this Plea Agreement. No one has threatened or forced Avin International Ltd in any way to enter into this Plea Agreement. Avin International Ltd is satisfied by the representation of its attorneys in this matter.

Gregory F. Linsin
Authorized Representative

On behalf of Defendant Kriti Ruby Special Maritime Enterprise, I have been authorized by a corporate resolution to sign this Plea Agreement and bind Kriti Ruby Special Maritime Enterprise. Kriti Ruby Special Maritime Enterprise has been advised by its attorneys of its rights, of possible defenses, of the applicable Sentencing Guideline provisions, and of the consequences of entering into this Plea Agreement. Kriti Ruby Special Maritime Enterprise voluntarily agrees to all of the terms of this Plea Agreement. No promises or inducements have been made to Kriti Ruby Special Maritime Enterprise other than those contained in this Plea Agreement. No one has threatened or forced Kriti Ruby Special Maritime Enterprise in any way to enter into this Plea Agreement. Kriti Ruby Special Maritime Enterprise is satisfied by the representation of its attorneys in this matter.

Gregory F. Linsin
Authorized Representative

I am counsel for Avin International Ltd and Kriti Ruby Special Maritime Enterprise and have discussed every part of this Plea Agreement with authorized representatives of Avin International Ltd and Kriti Ruby Special Maritime Enterprise. Further, I have fully advised the authorized representatives of Avin International Ltd and Kriti Ruby Special Maritime Enterprise of their rights, of possible defenses, of the applicable Sentencing Guidelines provisions, and of the consequences of entering into this Plea Agreement. To my knowledge, the decisions of Avin International Ltd and Kriti Ruby Special Maritime Enterprise to enter into this Plea Agreement are informed and voluntary.

November 5, 2024

Kierstan L. Carlson, Esq.
Blank Rome LLP
Counsel for Defendants
Avin International Ltd
Kriti Ruby Special Maritime Enterprise

Date

**ATTACHMENT 1**
**JOINT FACTUAL STATEMENT**

The United States Attorneys for the District of New Jersey and the Middle District of Florida, and the Environmental Crimes Section of the U.S. Department of Justice (collectively, the "United States"), and Defendants Avin International Ltd (hereinafter, "Avin"), and Kriti Ruby Special Maritime Enterprise (hereinafter, "Kriti Ruby SME") (collectively, "Defendants"), agree that this Joint Factual Statement is true and accurate and provides a sufficient factual basis for the guilty pleas of Avin and Kriti Ruby SME to two counts of violating Title 33, United States Code, Section 1908(a) and 33 C.F.R. § 151.25, also known as the Act to Prevent Pollution from Ships ("APPS"); one count of Falsifying Records, in violation of Title 18, United States Code, Section 1519; and one count of Obstruction of Proceedings, in violation of Title 18, United States Code, Section 1505. Defendants agree that, had this matter proceeded to trial, the United States would have proven these charges and the facts contained in this Joint Factual Statement beyond a reasonable doubt.

I. Introduction

Avin is a shipping company with an established office in Athens, Greece. It is the operator of 23 commercial oil or chemical tankers, some of which operate in U.S. waters. Kriti Ruby SME owns one vessel, the *Motor Tanker Kriti Ruby* (hereinafter, the "*M/T Kriti* Ruby" or the "vessel") and shares an office with Avin in Athens, Greece. From at least as early as in or about May 2022 through on or about September 15, 2022, Avin commercially operated and managed the *M/T Kriti Ruby* and Kriti Ruby SME served as the vessel's owner. The *M/T Kriti Ruby* is a 29,832 gross ton ocean-going oil tanker that transported petroleum products among the United States, Europe and Africa.

The vessel's Engine Department was headed by a Chief Engineer, who was assisted by a Second Engineer, two Third Engineers, an Electrician, and two Wipers. The Chief Engineer reported directly to the Master of the vessel and to shore-based personnel. Each crew member of the Engine Department was an agent or employee of Avin and Kriti Ruby SME and acted within the scope of that agency or employment and for the intended benefit, at least in part, of Avin and Kriti Ruby SME.

II. Transfers and Overboard Discharges of Oily Bilge Water from the *M/T Kriti Ruby*

On multiple occasions, from at least as early as in or about May 2022 through in or about September 2022 (hereinafter, the "relevant time period"), Engine Department crew members transferred oily bilge water from machinery space bilges of the *M/T Kriti Ruby*, using portable pumps, known as Wilden pumps, and flexible hoses (hereinafter, collectively, the "bypass equipment"), to the vessel's Sewage Holding Tank. The contents of the Sewage Holding Tank were subsequently discharged overboard into the sea while the vessel was underway, in violation of the 1973 International Convention for the Prevention of Pollution from Ships; and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships (hereinafter, collectively, "MARPOL"), an international treaty to which the United States is a party.

MARPOL prohibits discharges of oily mixtures into the sea unless, among other things, the discharges contain no greater than 15 parts of oil per million parts of water by volume ("15 ppm"). To facilitate the discharge of oily mixtures without violating MARPOL, vessels like the *M/T Kriti Ruby* are required to have a pollution control device known as an Oily Water Separator. Oily Water Separators are designed to process oily mixtures from bilges to produce effluent containing no greater than 15 ppm of oil, as measured by the equipment's Oil Content Monitor, which can be discharged overboard through an overboard discharge valve. If a properly functioning Oil Content Monitor detects an oil content greater than 15 ppm in the effluent, it sounds an alarm and a three way valve diverts flow back to the bilges or to a storage tank designed to hold bilge water to prevent a discharge overboard of greater than 15 ppm.

During the relevant time period, senior engineering officers ordered lower-level Engine Department crew members to transfer machinery space bilge water, using the bypass equipment, to the Sewage Holding Tank for discharge overboard.[1] The bypass equipment, which contained no filter, suctioned water from multiple bilge wells and pumped it to an upper floor of the Engine Room into the Sewage Holding Tank through an opening at the top of the tank, as depicted in Exhibit A attached hereto. The oily bilge water was then discharged via the Sewage Holding Tank's overboard discharge valve without processing it through the Oily Water Separator.

---

[1] On or about September 4, 2022, the Second Engineer himself used the bypass equipment to transfer oily bilge water from the vessel's starboard bilge well to the Sewage Holding Tank.

III. Transfers, and Overboard Discharges of Oily Mixtures from the Incinerator Waste Oil Tank on the *M/T Kriti Ruby*

In or around August 2022, the vessel's Second Engineer installed a copper tube on an incinerator tank that contained waste oil to drain condensation from that tank to a bucket. The Second Engineer and lower-level Engine Department crew members, with the Chief Engineer's knowledge, emptied the oily mixtures from the bucket into an Engine Room toilet, the contents of which were then transferred to the vessel's Sewage Treatment Plant and then discharged into the sea without being filtered through the vessel's Oily Water Separator. These discharges were conducted in violation of MARPOL, which requires that oily mixtures that cannot be processed through the Oily Water Separator be disposed of by either burning the oily waste in the vessel's incinerator or off-loading it to shore or to another facility for proper disposal.

IV. Falsification of Oil Record Book

The vessel's senior engineering officers concealed the transfers and discharges overboard of oily bilge water by failing to enter those transfers and discharges in the vessel's Oil Record Book. The Oil Record Book is a logbook required by MARPOL and the regulations promulgated under APPS. APPS regulations require that each operation involving the disposal or discharge overboard of bilge water be fully recorded in the Oil Record Book without delay, and on a tank-by-tank basis, by the person or persons in charge of the operation. *See* 33 C.F.R. § 151.25(a), (d), and (h).

Between in or around August 2022 and September 15, 2022, the vessel's Chief Engineer also failed to record in the Oil Record Book the transfers of oily mixtures from the incinerator waste oil tank via the Engine Room toilet to the Sewage Treatment Plant and to record the subsequent overboard discharges from the Sewage Treatment Plant without processing the oily mixtures through the Oily Water Separator. MARPOL and the regulations promulgated under APPS require that all emergency, accidental, or other exceptional discharges of oil or oily mixtures, including a statement of the circumstances of, and reasons for, the discharge, be recorded in the Oil Record Book. *See* 33 C.F.R. § 151.25(g).

On or about May 22, 2022, and on or about May 26, 2022, the *M/T Kriti Ruby* docked at petroleum offloading terminals in or around Jacksonville, Florida. At the time the vessel docked at these terminals, senior engineering officers knowingly maintained an Oil Record Book on board the vessel that failed to record the following: (1) transfers of oily bilge water to the Sewage Holding Tank; and (2)

overboard discharges of oily bilge water from the Sewage Holding Tank without processing the oily bilge water through the Oily Water Separator.

In or about September 2022, the vessel entered a petroleum offloading terminal, along the Arthur Kill, in and around Sewaren, New Jersey (hereinafter, the "Sewaren Terminal"). On or about September 15, 2022, the U.S. Coast Guard (hereinafter, the "Coast Guard") boarded the vessel to conduct an inspection. During that inspection, the Chief Engineer knowingly presented an Oil Record Book to the Coast Guard that failed to record the following: (1) transfers of oily bilge water to the Sewage Holding Tank; (2) transfers of oily mixtures from the incinerator waste oil tank to the Sewage Treatment Plant via the Engine Room toilet; (3) overboard discharges of oily bilge water from the Sewage Holding Tank without processing the oily bilge water through the Oily Water Separator; and (4) overboard discharges of oily mixtures from the Sewage Treatment Plant without processing the oily mixtures through the Oily Water Separator.

V. <u>Obstruction of Justice</u>

In addition to maintaining and presenting a false Oil Record Book as described above, the Engine Department crew obstructed, and attempted to obstruct, the Coast Guard's inspection of the vessel by hiding the bypass equipment in a void space in the vessel's Engine Room, known as a cofferdam, and sealing the hatch cover on the cofferdam. The Engine Department crew did so prior to the vessel arriving at the terminals in Jacksonville, Florida, and Sewaren, New Jersey, in May and September 2022, respectively, to make it difficult for the Coast Guard or other authorities to detect the bypass equipment. The concealed equipment was nonetheless discovered by the Coast Guard during its inspection of the vessel at the Sewaren Terminal, as depicted in Exhibit B attached hereto.

# EXHIBIT A






# EXHIBIT B



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Crim No. 24-______ |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| AVIN INTERNATIONAL LTD, and | ) | |
| | ) | |
| KRITI RUBY SPECIAL MARITIME | ) | |
| ENTERPRISE | ) | |
| Defendants. | ) | |

ATTACHMENT 2 - ENVIRONMENTAL COMPLIANCE PLAN

## TABLE OF CONTENTS

**I. APPLICABILITY AND PURPOSE ........ 1**

A. Applicability ........ 1

B. Persons to Whom Applicable ........ 1

C. Purpose ........ 1

D. Incorporation ........ 2

E. Supplementation of Crews and Shore Side Resources ........ 2

F. Consequences of Employee Obstruction of Environmental Compliance Plan ........ 2

G. Submission of Documents ........ 2

H. Modifications ........ 3

I. Obligation to Maintain Copies of Environmental Compliance Plan and Environmental Management System ........ 3

J. Right of Inspection ........ 3

**II. CORPORATE STRUCTURE AND RESPONSIBILITIES ........ 5**

A. Corporate Compliance Manager ........ 5

B. Quality Assurance and Operational Integrity Department ........ 7

C. Reporting of Non-Compliance by Employees and Crew Members (Open Reporting) .8

D. Corporate Accountability ........ 9

E. Full Company-Wide Cooperation ........ 9

**III. VESSEL PERSONNEL ........ 10**

A. Chief Engineer ........ 10

B. Master ........ 11

**IV. SHORE SIDE PERSONNEL SERVING IN ANY CAPACITY ........ 12**

A. Operation, Maintenance and Repair Personnel ........ 12

B. Engineering Personnel ........ 13

C. Spare Parts Identification and Rapid Replacement Program ........ 13

**V. COURT APPOINTED MONITOR ........ 13**

A. Selection of Court Appointed Monitor ........ 13

B. Staff Qualifications ....................13
C. Reports and Notifications ....................14
D. Tasks and Responsibilities ....................14

**VI. THIRD PARTY AUDITOR .................... 16**
A. Selection of Third Party Auditor ....................16
B. Marine Engineer Requirement ....................16
C. Prior Services ....................16
D. Duties and Qualifications ....................16
E. Contractual Independence ....................17
F. Functional Independence ....................17
G. Adequacy of Staff ....................17
H. Court Appointed Monitor Access ....................17
I. Third Party Auditor Auditing Process ....................17
J. Third Party Auditor's Report of Findings ....................20

**VII. AUDITING PROCESS .................... 21**
A. Audit Phases ....................21
B. Timing and Numbers of Audits ....................21
C. Third Party Auditor Access ....................22
D. Initial Audit ....................22
E. Ongoing Audits ....................28
F. Final Audits ....................28
G. Deficiencies/Non-Conformities ....................28
H. Major Non-Conformities ....................28

**VIII. ENGINEERING REQUIREMENTS .................... 29**
A. Time of Implementation ....................29
B. Environmental Tag System ....................29
C. Bilge-Main Cross Connections ....................30
D. Emergency Bilge Suctions ....................31
E. Blank Flanges ....................31

F. Bilge Sampling and Oil Water Separator Performance Analysis ....31
G. Ship Source Pollution Research and Development Project ....32
H. Additional Oil Water Separator and Oil Content Monitor Requirements ....32
I. Record Keeping ....34
J. Oil Record Book Entries ....34
K. Tank Sounding Record Book ....34
M. Oil-to-Sea Interfaces ....34
N. Fleet Engineering Survey ....35

**IX. TIME REQUIREMENTS – SUBMITTAL OF ENVIRONMENTAL MANAGEMENT SYSTEM ....35**

A. Updated Environmental Management System ....35
B. Obligation to Submit Copies of EMS ....36
C. Comments on EMS ....36
D. Obligation to Submit Proposed EMS Revisions ....36
E. Review of Proposed EMS Revisions ....36

**X. CHANGES IN OWNERSHIP AND OPERATION ....36**

A. Notification of Changes ....36
B. Acquiring Additional Vessels ....37

**XI. SELF-ENFORCEMENT ....38**

A. Self-Enforcement Procedures ....38

**XII. SCHEDULE ....38**

A. Requirement to Comply With Schedule ....38

**XIII. REPORTS AND COMMUNICATIONS ....38**

A. Submission of Documents ....39

**XIV. ACKNOWLEDGEMENT ....39**

# ENVIRONMENTAL COMPLIANCE PLAN

The following standards and requirements for an Environmental Compliance Plan ("ECP") have been prepared pursuant to the Plea Agreement dated this same date between Defendants, Avin International Ltd ("Avin") and Kriti Ruby Special Maritime Enterprise (collectively "Defendants"), and the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the Middle District of Florida, and the Environmental Crimes Section of the United States Department of Justice (hereinafter, collectively, the "Government"). Compliance with all of the terms and standards of the ECP is a requirement of the Plea Agreement and a special condition of Defendants' probation. This ECP applies to Defendants and any subsidiaries or assigns.

## I. APPLICABILITY AND PURPOSE

### A. Applicability

This ECP applies to all oceangoing vessels that are owned, operated, technically managed or manned by Defendants that are required to carry a Certificate of Financial Responsibility issued pursuant to the Oil Pollution Act of 1990 ("COFR"). Attachment 1 contains a list of vessels covered as of the execution of this Plea Agreement. Attachment 1 may be modified on occasion in accordance with Section X. All vessels listed in Attachment 1, as amended pursuant to Section X, shall be subject to the requirements of this ECP (hereinafter, collectively, the "Covered Vessels"). Covered Vessels for which Defendants have relinquished ownership, operation, ceased technical management of, which have been scrapped, or which are no longer required to have a COFR, shall be relieved of the requirements of this ECP. Written notification of any of the foregoing shall be made in accordance with the requirements of Section X. Avin shall provide all parties with an updated list of the Covered Vessels on a quarterly basis, if there are any changes.

### B. Persons to Whom Applicable

This ECP shall also apply to all shore side employees and crews involved in the operation, repair and supplying of the Covered Vessels.

### C. Purpose

The purpose of the ECP is to ensure that all Covered Vessels comply with all applicable Marine Environmental Protection Requirements established under applicable international, flag state, port state, coastal state, and United States laws including, but not limited to, the International Convention for the Prevention of Pollution from Ships ("MARPOL"), and all applicable United States federal and state statutes and regulations including, but not limited to the Ports and Waterways Safety Act ("PWSA"), the Act to Prevent Pollution from Ships ("APPS"), the Clean Water Act ("CWA"), and Oil Pollution Act of 1990 ("OPA 90") (hereinafter, collectively, "Marine

Environmental Protection Requirements"), and to the additional requirements and policies established by this ECP itself. In the case of a conflict between this ECP and any of the aforementioned requirements such that the ECP is less restrictive, then the more restrictive authority shall govern.

**D. Incorporation**

This ECP shall be incorporated into the Plea Agreement by reference. Compliance with the terms of this ECP will be a special condition of probation. Failure to comply with any part of this ECP, including but not limited to, refusal to pay valid charges for the Court Appointed Monitor ("CAM") or the Third Party Auditor ("TPA"), or any failure to provide these or other personnel, auditors or inspectors the material support needed to achieve the objectives of this ECP, or failure to provide full unrestricted access to vessels, facilities, personnel or documents (subject only to safety and security considerations), may be a basis on which the Government may move to revoke or modify Defendants' probation.

**E. Supplementation of Crews and Shore Side Resources**

In the course of implementing this ECP, should inadequacies in the size and capabilities of vessel crews be proven as a contributing factor to their inability to manage waste streams, Avin agrees to supplement crews as needed, consistent with vessels' lifesaving arrangements, and/or to provide additional shore side resources.

**F. Consequences of Employee Obstruction of ECP**

Subject to applicable labor laws, Avin shall take appropriate action, up to and including dismissal, against any employee who obstructs, hinders, or presents false information or makes false statements during any inspection, monitoring, or auditing, or inspection function required by this ECP, or, to any United States' authority performing an inspection or Port State Control activity.

**G. Submission of Documents**

Audits, reports, and other documents required by this ECP shall be submitted to the Interested Parties. These submissions, to the maximum extent practical, must be done electronically and contain high resolution photographic and videotaped (if applicable) documentation. The Government will provide to Avin at the time of sentencing the contact information for the Interested Parties that must receive the submissions. In addition to any other provided contact information from the U.S. Coast Guard Commandant, Office of Vessel Activities, the following email address must always be included: hqs-smb-cg-inv-ecp@uscg.mil. Interested Parties are the Government, the USPO, and the U.S. Coast Guard.

### H. Modifications

Any proposed modification to this ECP must be made in writing and signed by Avin. Modifications proposed by Avin shall be submitted to the Government. The Government shall have 30 business days from the date of receipt to provide written comments on the proposed modification. If no comments are provided within the 30 day period, the modification will be deemed accepted and shall become effective. If the Government objects and the parties are unable to resolve the issue, either Avin or the Government may file a motion before the United States District Court with responsibility to supervise probation as designated at the time of sentencing.

### I. Obligation to Maintain Copies of ECP and EMS

During the probationary period, a copy of the ECP and EMS (as defined below) must be kept at all times in pre-designated locations within each vessel covered by this ECP, where it can be readily accessed by senior shipboard personnel. Such locations must include the Master's office, the Chief Engineer's office, the engine control room, and the bridge.

### J. Right of Inspection

Avin understands that representatives of the United States Coast Guard may board, audit, or inspect vessels covered under this ECP at any time while such vessels are found within the jurisdiction of the United States.

### K. Definitions

1. "Audit Finding" means an Observation, Non-Conformity, or Major Non-Conformity identified during an audit required under this ECP.

2. "Best Practices" means those policies and procedures that, based on experience and research, consistently and reliably prevent an Audit Finding.

3. "BOD" means Board of Directors.

4. "CAM" means the Court Appointed Monitor appointed pursuant to Section V.

5. "CEO" means the Chief Executive Officer of Avin.

6. "Covered Vessels" means those vessels technically managed by Avin that are subject to this ECP because they are required to have a COFR.

7. "Critical Environmental Equipment Spare Parts" means all parts necessary for Critical Environmental Equipment to operate effectively.

8. "Critical Environmental Equipment" means all pollution prevention equipment, as well as equipment necessary to limit or prevent propulsion shaft leakages and grey water and sewage tank overflows.

9. "ECP" means this Environmental Compliance Plan.

10. "EMS" means Environmental Management System, which is the set of Avin's policies, procedures, and other documentation included in the Safety Management System established under the ISM Code.

11. "EPA" means the U.S. Environmental Protection Agency.

12. "Engineer" as it is used in this ECP shall be synonymous with the term "engineering officer."

13. "Government" means the United States Attorney's Office for the District of New Jersey and the Environmental Crimes Section of the United States Department of Justice.

14. "CCM" means Avin's Corporate Compliance Manager, which is synonymous to the Head Of Compliance as described in the Avin's SMS.

15. "Interested Parties" means the Government, the USPO, and the U.S. Coast Guard.

16. "Major Non-Conformity" means an observed situation where evidence indicates a violation of a Marine Environmental Protection Requirement or policies established by this ECP that consists of or contributes to the discharge or potential discharge of oil, or oily wastes, or other prohibited wastes into the water. It may also include the discovery of pollution prevention equipment determined to be incapable in terms of processing and monitoring capabilities or inadequate with respect to the quantities of wastes such equipment is required to process.

17. "Marine Environmental Protection Requirements" means environmental protection requirements imposed by laws and regulations.

18. "Non-Conformity" means an observed situation where evidence indicates a violation of a Marine Environmental Protection Requirement or a policy or procedure established by this ECP, regardless of whether it is immediately repaired or remedied.

19. "Observation" means a statement of fact made during an audit that could lead to a Non-Conformity.

20. "ORB" means a vessel's Oil Record Book as required by MARPOL.

21. "Satisfactory" means, when used on auditing forms and guides, the line item requirement is met, and the item satisfies the ECP.

22. "TPA" means the Third Party Auditor appointed pursuant to Section VI.

23. "USPO" means the U.S. Probation Office.

## II. CORPORATE STRUCTURE AND RESPONSIBILITIES

### A. Corporate Compliance Manager ("CCM")

1. Within 60 days after the entry of the Judgment of Conviction, Avin shall designate a senior corporate officer as the Corporate Compliance Manager ("CCM") who shall report directly to the CEO. The CCM position must be filled by an individual with a significant maritime vessel operational background, who possesses the authority to ensure full implementation of this ECP, and who is thoroughly familiar with the requirements of this ECP, and domestic and international maritime environmental laws and regulations. Avin shall provide the name of the CCM and shall identify means of communicating with the CCM to the Government.

2. The CCM shall be authorized to access all records, documents, facilities, and vessels throughout Avin's organizations for the purpose of implementing this ECP.

3. The CCM shall work closely with the TPA and will ensure that the audits to be performed by qualified superintendents will be overseen by Avin's Health, Safety, Security, & Environment Department ("HSSE") and the TPA under this ECP are carried out.

4. The CCM shall be responsible for ensuring that observations and any recommendations resulting from any audit under this ECP

are appropriately documented, tracked, and resolved and that such resolutions are thoroughly documented in a format that can be readily audited. This documentation shall be made available to any personnel performing audit functions under this ECP, to the United States Probation Office ("USPO)", and the Government.

5. The CCM shall be responsible for developing a tracking mechanism to ensure that Avin considers and takes corrective action on recommendations made by the TPA, within 60 days. Where corrective action takes longer than 60 days, the CCM shall ensure corrective action is taken as soon as possible, and shall provide the TPA, CAM, and the Government with the reason(s) for delay.

6. The CCM shall be responsible for establishing and overseeing Avin's Open Reporting System, as described more fully below.

7. The CCM shall be responsible for ensuring that revisions/updates are made to the Environmental Management System ("EMS") as described more fully below.

8. The CCM shall be responsible to ensure that each Covered Vessel is provided adequate funding for shore side disposal of wastes, including bilge water, (without limitation to charterer's primary obligation for any shore side disposal of bilge water for which charterer is responsible), sludge, garbage, and the minimization and management of waste streams, and the maintenance and technical upgrades of environmental equipment and funding necessary to meet all the other requirements of this ECP. Avin's budgets shall include unrestricted funding for shoreside disposal of wastes by the Covered Vessel, and need not include an allocation on an item by item basis. The CCM shall be responsible for approving the adequacy of vessel operating budgets, including costs related to the operation, maintenance and repair of pollution prevention equipment, use of shore side reception facilities, labor costs relating to maintenance of machinery spaces and other related costs necessary to meet the objectives of the ECP.

9. The CCM shall review, investigate, and document in a timely fashion any reports of non-compliance received from employees and shall initiate, monitor, and document all actions taken as a result of such reports. The CCM shall maintain records of such reports and action taken, and shall make them available for review by the TPA and the CAM.

10. The CCM shall develop and communicate to all employees Avin's policy that Avin will not tolerate retaliation against those who report non-compliance and will develop and communicate a policy that makes failure to notify regarding any violation of this ECP, the EMS, or other maritime environmental protection requirements, grounds for discipline or dismissal, subject to applicable labor laws. However, Avin may take appropriate disciplinary or legal action for wrongdoing so long as it is not retaliatory.

11. The CCM shall be responsible for ensuring that each new employee, or hire, is trained that environmental policy compliance, and accurate and truthful record-keeping are extremely important and the company will take appropriate disciplinary actions for any violations.

12. The CCM shall be responsible for ensuring the development of the Training Requirements detailed in Attachment 3.

13. The CCM shall be responsible for ensuring the full implementation of the Engineering Requirements established in Section VIII of this ECP.

14. The CCM shall be responsible for ensuring the development and maintenance of a system to track and report each Covered Vessel's machinery space waste quantities and capacities, as well as garbage production and management.

**B. HSSE Department**

1. Avin shall maintain an HSSE Department. This department shall report directly to the CEO. This department shall:

    a. Be responsible for executing and or organizing the execution of internal audits through Marine or Technical Superintendents and or third party appointed auditors of 100 percent of the Covered Vessels annually to ISM Code requirements (incorporating safety, environmental and operational standards);

    b. Investigate Open Reports, as directed by the CEO;

    c. Investigate oil pollution incidents and vessels casualties as per Avin's ISM procedures and as directed by the CEO; and

d. Make recommendations to the CCM regarding improvements to the EMS.

2. Technical and Marine Superintendents may serve as members of the HSSE Department with the scope to conduct internal audits, but such personnel may not conduct audits of Covered Vessels for which they hold operational responsibility.

**C. Reporting of Non-Compliance by Employees and Crew Members (Open Reporting)**

1. Avin shall maintain an Open Reporting System by which shore side and vessel employees may anonymously report issues of non-compliance with this ECP, the EMS, and other Marine Environmental Protection Requirements via free email or toll-free phone number (any expenses related to such a call shall be borne exclusively by Avin and not the crew member or employee).

2. Avin must provide crew members with information about its Open Reporting System prior to each contract of employment and shall inform the crew members of the availability of this reporting system by posting notices in lounge spaces of officers and crew members, the engine control room, common areas of the vessels, as well as through company publications and organization-wide announcements issued on at least a quarterly basis.

3. The Open Reporting System shall include provisions that prohibit retaliation against those who report non-compliance and shall include a written policy that makes failure to notify regarding any violation of the EMS or other Maritime Environmental Protection Requirements grounds for discipline or dismissal, subject to applicable labor laws. However, Avin may take appropriate disciplinary or legal action for wrongdoing so long as it is not retaliatory.

4. The CCM shall be responsible for maintaining this Open Reporting System.

5. Subject to applicable laws, the CCM shall make arrangements to ensure anonymity of such reporting when desired by the individual making the report.

6. The CCM shall be informed of each such Open Report, and shall provide a copy of any report containing an allegation of environmental noncompliance to the CEO and the CAM.

7. Avin shall publish reports to the Covered Vessels on a quarterly basis concerning the Open Reporting System, to demonstrate that the system is working. Such reports shall be generated even if no open reports have been received during the preceding quarter.

## D. Corporate Accountability

1. The CCM shall make quarterly reports to the CEO concerning compliance with and implementation of this ECP, the EMS, and other Maritime Environmental Protection Requirements.

2. Annually, the CCM shall provide a summary of the reports to Defendants' BODs. All issues of non-compliance will be communicated, along with any corrective action taken. Copies of these reports will be provided to the Government.

3. The CCM shall ensure immediate notification to the Government of any circumstances where Avin fails to fully support and finance the implementation of this ECP and the EMS.

## E. Full Company-Wide Cooperation

1. Avin shall communicate to its shipboard and shore staff its commitment to environmental compliance and to all terms in this ECP.

2. In the first quarter of every year, Avin Senior Management shall communicate by available means (via video, e-mail, or other means) to its shipboard and shore staff by the most effective electronic manner possible, its commitment to the environment, safety, quality, and commitment to this ECP.

3. The CCM shall take all necessary steps to ensure the full cooperation of all employees and agents during all activities required by this ECP and EMS.

4. Avin shall provide cooperation to all persons performing audits and inspections, regardless of location. The CCM shall ensure that the TPA and any other inspection, auditing, or monitoring personnel involved in the auditing of any vessel have unrestricted access to all vessel areas (subject only to safety and security considerations), documentation, personnel, material, and equipment. Every audited vessel or office shall provide private locations for one-on-one interviews between employees and various inspection, auditing or monitoring personnel.

## III. VESSEL PERSONNEL

### A. Chief Engineer

1. Chief Engineers on board all Covered Vessels shall:

   a. Ensure compliance with the Engineering Requirements established in Section VIII of this ECP (as applicable to his/her vessel).

   b. Assist in the audit process to ensure compliance with the various requirements, policies and procedures addressed in Section VIII.

   c. Measure, monitor, and manage shipboard machinery space generated wastes and the conditions of any equipment having oil to sea interfaces on a daily basis (weather and safety permitting).

   d. Timely resolve (through repairs and/or applicable EMS procedures) engine room, machinery space, or pump room related environmental concerns, such as inoperative or ineffective pollution prevention equipment, waste handling or monitoring equipment, and leakages (except those necessary for packing cooling) stemming from pump seals, packing glands or line breaks, or due to any other causes contributing to the accumulations of bilge fluids, oily mixtures and sludge type wastes.

   e. Ensure that all Engine Room wastes that are subject to special handling requirements are properly managed.

   f. Ensure that all shipboard engine room personnel have appropriate training on environmental policies and procedures, including but not limited to training on the operation and use, as appropriate for their position and related responsibilities, of pollution prevention equipment bilge and ballast pumps, incinerator, Oil Water Separator ("OWS") and the making of entries in the ORBs, Garbage Record Book or any other logs required by this ECP or other maritime environmental protection requirements.

   g. Ensure that the Chief Engineer's handover notes include an environmental component and description of the current status of operation, maintenance, and repair, for the Incinerator, OWS, Oil Content Monitor ("OCM") and

other pollution prevention procedures or equipment, the status of spare parts for the aforementioned equipment, and an estimation of the day-to-day bilge loads and accumulations. If a company-specified format for handover notes is used, this shall require descriptive entries as stated above, not solely answers marked as "Yes" or "No".

h. Ensure that all Engine Room records, soundings and tank measurements are accurate and recorded truthfully. Ensure that rough notes, sounding logs and/or other documents used by engine room personnel to record tank soundings and monitor tank levels are maintained throughout the course of probation. Such notes shall be dated even if managed on scrap paper. If the scrap paper becomes unreadable due to oil or damage, such notes shall be reproduced, to the extent possible, and maintained.

i. Report all instances where inadequate response associated with spare parts delivery, maintenance and repair or other factors caused conditions leading to excessive production in shipboard waste streams.

**B. Master**

1. In addition to any other existing statutory and regulatory requirements, the Master of each Covered Vessel bound for the United States shall ensure that prompt reports are made to the United States Coast Guard of any equipment malfunction related to Marine Environmental Protection Requirements, in its 96-hour Electronic Notice of Arrival ("eNOA") into a United States' port. Additionally, such reports shall be copied to the United States Coast Guard Captain of the Port of the next port of call in the United States, if known. In addition to his/her regular duties, the Master shall:

a. Ensure crewmembers' compliance with the ECP, the EMS, MARPOL, Ballast Water Management and all applicable Marine Environmental Protection Requirements, including the Environmental Protection Agency's ("EPA") Vessel General Permit ("VGP") requirements when in U.S. waters. Crewmember compliance with such requirements will be incorporated as a positive factor in performance evaluations. Failure to comply with such requirements will be incorporated as a negative factor in performance evaluations and may lead to dismissal or non-rehire.

b. Maintain on board the Covered Vessel all records required by international conventions and treaties, including SOLAS, the ISM Code, MARPOL, applicable Federal and state statutes and regulations, and any additional documents or records required under this ECP and EMS. Records shall be maintained for the period specified by the vessel's Flag Administration or the relevant law. Additionally the Master will make such records available to the TPA and the Government upon request.

c. Ensure that every crewmember has received appropriate training necessary to ensure compliance with this ECP, the EMS, and other Marine Environmental Protection Requirements and that the proper records of all training on environmental matters are maintained.

d. Maintain replacement environmental tags and used environmental tags as set forth in Section VIII of this ECP in the vessel's safe and inspect each damaged environmental tag number to ensure environmental tags having identical numbers are never used. Include an inventory of the unused environmental tags as a required component of the Master's handover notes.

e. Ensure the use and maintenance of, and personally review, handover notes for the prior Master, Chief Officer, Chief Engineer, and Second Engineer when joining the vessel on a new contract. Ensure that such handover notes shall include a descriptive environmental compliance component and include information related to the status, handling and discharge of any vessel generated wastes or garbage and the operation of the OWS, OCM and Incinerator.

## IV. SHORE SIDE PERSONNEL SERVING IN ANY CAPACITY

### A. Operation, Maintenance and Repair Personnel

Avin shall require all shore side employees having routine involvement with any aspect of the operation, maintenance and repair of Covered Vessels to report in writing any information related to the vessel's or crew's inability to comply with this ECP or any other Marine Environmental Protection Requirement. This may include, but is not limited to, information learned from reviewing or working on orders to purchase lubrication oils, spare parts for pollution prevention equipment or equipment having oil-to-sea interfaces, requests for additional cleaning crews, reviewing or receiving information related to repairs or replacement of pollution

prevention equipment, piping, or related systems, discussions with shipboard personnel, or employment of divers for underwater surveys. Such information shall also include knowledge obtained during any ship visits, audits, or inspections, regardless of the stated purpose of the particular visit, audit, or inspection.

### B. Engineering Personnel

Shore side engineering personnel shall develop and implement a system to identify critical components such as pump seals, flange gaskets, etc., that require rapid replacement in order to minimize leakages and reduce waste stream development in machinery spaces.

C. Spare Parts Identification and Rapid Replacement Program Avin shall implement a spare parts identification and rapid replacement program covering all pollution prevention equipment. Avin agrees to maintain a centralized system for managing critical equipment spare parts ordering and distribution. The Purchasing Department (or equivalent) shall be trained in recognizing critical equipment spare orders and supplying such spares to vessels with a minimum of delay. Avin agrees to advise the owners of any Covered Vessel if pollution prevention equipment should be replaced or upgraded.

## V. COURT APPOINTED MONITOR

### A. Selection of Court Appointed Monitor

As part of the ECP, Avin agrees to pay for a CAM who will be selected by the Government and appointed by the Court, and who will be tasked to report to the Government throughout the probation period. Within 30 days from the entry of the Judgment of Conviction, Avin will submit a list of three qualified candidates for the CAM position to the Government. In the event that the Government does not find any of the candidates qualified or if for any other reason none of the candidates is acceptable to the Government, the Government may request Avin to nominate additional candidates. The Government may require a new CAM at any time during the period of probation if it finds the CAM's work unsatisfactory.

### B. Staff Qualifications

The CAM must have staff with the following experience:

1. expertise and competence in the regulatory programs under United States and international marine safety and environmental laws; and

2. expertise and competence to assess whether Avin has adequate management systems, particularly human and fiscal resources, in place to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance; and

3. demonstrated capability to evaluate Avin's effort and commitment in satisfying the requirements of this ECP and Avin's Safety Management System (or equivalent), including the EMS.

**C. Reports and Notifications**

Avin shall ensure that the CAM is provided all reports and notifications as established in this ECP, as specified in Attachment 5.

**D. Tasks and Responsibilities**

The CAM shall be assigned the following tasks and responsibilities and shall be required to provide written submissions to the Government and USPO as follows:

1. Review the relationship between Avin and the TPA and evaluate the adequacy of measures taken to ensure that the TPA acts with independence.

2. Conduct a review and submit an annual report to Avin and the Government regarding the rounds of audits conducted by the TPA pursuant to the Plea Agreement and this ECP. The CAM's reports shall provide a summary of the findings regarding the adequacy of the Audits required by this ECP and the adequacy of recommendations for change, as found necessary.

3. The annual report shall also include and address any other information of which the CAM becomes aware pertaining to Avin's capabilities to meet the objectives of this ECP and any other Marine Environmental Protection Requirement, including any inadequacies of the TPA or with respect to Avin's performance, whether personnel-based or related to any of its vessels, systems, equipment, or components.

4. If the CAM receives information regarding a violation of any existing Marine Environmental Protection Requirement or requirement of this ECP, or a failure of Avin to act upon an agreed upon recommendation of the TPA, the CAM must immediately report the occurrence to the Government. At any time during the probationary period the CAM may inspect or investigate any aspect of the TPA activities as they relate to the requirements of

this ECP or with respect to Avin's operations, and shall be provided full access to all records, audit personnel, vessels, and shore side facilities as is necessary to perform its duties.

5. Provide any additional reports, in both electronic and hard copy form, to the Government, as requested by the Government or as appropriate and to include inadequacies in the audit process or violations of the terms and conditions of the ECP and EMS, as well as any other findings of significant problems or deficiencies. Make recommendations to the Government as to the adequacy of Avin in meeting the objectives of this ECP.

6. During years one through three of the probationary period, conduct a review of Avin's internal environmental audits as necessary to assess the ability of Avin's internal audit process to accomplish the objectives of this ECP and to identify non-conformities with any other Marine Environmental Protection Requirements, including any inadequacies with respect to Avin's performance, whether personnel-based or related to any of its vessels, systems, equipment, or components. During the final year of the probationary period, conduct a review of all Avin's internal environmental audits to assess the implementation of its internal audit process. Throughout the probationary period, Avin agrees to provide the CAM with access to all internal environmental audit reports and supporting documents.

7. As referenced in Section VII.F., the CAM shall provide independent verification of the status of Avin's compliance with this ECP.

8. At the conclusion of probation, the CAM shall provide to the Government the total amount that it had billed Avin for the performance of its services pursuant and related to the ECP.

**E. Confidentiality**

The CAM shall maintain the confidentiality of any non-public information made available to the CAM by Avin (whether directly or through the TPA or the Interested Parties). The CAM shall only share such information with the court, the Government, USPO, and the TPA as appropriate under this ECP. The CAM shall

that ensure any party hired by the CAM to provide services under this ECP complies with this provision.

## VI. THIRD PARTY AUDITOR

### A. Selection of Third Party Auditor

As part of the ECP, Avin agrees to pay for a TPA that will be selected by the Government and who shall report to the Government during the entire period of probation. Within 30 days after the entry of the Judgment of Conviction, Avin shall submit a list of three qualified candidates for the TPA position to the Government. In the event that the Government does not find any of the candidates qualified or if for any other reason the list of candidates is not acceptable to the Government, the Government may request Avin to nominate additional candidates to serve as the TPA. The Government may require a new TPA at any time during the period of probation if it finds the TPA's work unsatisfactory.

### B. Marine Engineer Requirement

The TPA shall employ an experienced senior level Marine Engineer (Chief, First or Second Engineers) to perform and/or oversee shipboard machinery space audits.

### C. Prior Services

An organization that has provided auditing services to Avin within 1 year prior to entry of the Judgment of Conviction may be considered by the Government to serve as the TPA, but only if the environmental audit criteria detailed in Section VII of this ECP are followed. At the conclusion of probation, the TPA shall provide to the Government the total amount that it had billed Avin for the performance of its services pursuant and related to this ECP.

### D. Duties and Qualifications

The duties of the TPA shall be to conduct the audits described herein and to issue Reports of Findings. Qualified candidates for the TPA include individuals or firms that have staff capable of applying International Standards Organization ("ISO") 19011 environmental management auditing criteria and have the following experience: experience as a shipboard Chief, First or Second Engineer; expertise and competence in the regulatory programs under United States and other Marine Environmental Protection Requirements; experience in performing environmental audits in industrial or maritime environments; sufficient expertise and competence to assess whether Avin has adequate policies, procedures and equipment in place to assure compliance with the ECP and to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance. The TPA position shall not be filled

by any individual or entity associated with the Classification Societies or Flag Administrations to which the Covered Vessels are classed or registered.

**E. Contractual Independence**

During the term of probation, the TPA shall not directly own any stock in Avin and must have no other ongoing contractual or business relationship, other than that of the TPA with Avin, unless expressly approved by the Government. The TPA must exercise independent judgment and ensure that the objectives of the Government as set forth in this ECP are met. Avin and the TPA shall notify the Government if any contractual relationships or proposed contractual relationships between Avin and the TPA arise during the term of probation.

**F. Functional Independence**

The TPA shall function independently of Avin. The TPA shall not receive or request approval of any form from any employee of Avin regarding the development, clearance or evaluation of any document, report, or communication of any kind, whether draft or final required by this ECP, though the TPA may ask questions of or seek clarification from Avin regarding technical or operational issues as necessary. If Avin disagrees with any of the recommendations made by the TPA, then Avin shall put its concerns in writing and submit to the TPA within 30 days.

**G. Adequacy of Staff**

The TPA must have adequate staff to perform the work required of this ECP. Due to the in-depth nature of the audit criteria, persons with specialized knowledge and experience will be required to perform the audits. The knowledge, skills and abilities of the TPA and staff must align with the criteria of the audits. Experienced personnel with extensive operational, maintenance and repair of shipboard and machinery space systems, equipment, and components is a prerequisite.

**H. Court Appointed Monitor Access**

The TPA agrees to provide the CAM full access to all records, personnel (including auditors) and any other information associated with its responsibilities in fulfilling the requirements of this ECP.

**I. TPA Auditing Process**

1. In an effort to fully investigate shipboard policies, procedures, conditions and equipment, the TPA may not share in advance with Avin personnel its audit checklists or other materials used to perform vessel audits. Audit check list items shall include narrative statements indicating how audit determinations were made. All identified audit check list item deficiencies or Major

Non-Conformities shall be described in narrative detail. On receipt of filled-out checklists from the TPA, Avin will not share these checklists or any of their contents with their other vessels, though Avin may implement fleetwide corrective actions regarding deficiencies identified in the audits.

2. The TPA shall have the sole discretion to select which Covered Vessels to review and evaluate, consistent with scheduling and availability of those Covered Vessels. The audits may take place overseas and/or during coastwise voyages. To achieve the objectives of this ECP the audits shall take place while the Covered Vessels are underway. Audits shall include a comprehensive evaluation of operations onboard the vessels. The content of each audit shall follow, at a minimum, the audit criteria addressed in Section VII of this ECP. If the TPA is not able to perform underway audits on the Covered Vessels because of scheduling conflicts or because the voyages are too long, the TPA and Avin will notify the Government.

3. If during the audits the CCM or the Government determine that Avin has inadequate policies, procedures and equipment in place to ensure compliance with this ECP and regulatory requirements, to correct non-compliance, or to prevent non-compliance, Avin will provide all necessary funding and resources to facilitate implementation of corrective measure recommended by the CCM or the Government. Also, if during any audit a violation of existing Marine Environmental Protection Requirements is noted, the TPA shall immediately notify the CCM and the CAM. The CCM shall ensure that the necessary notifications occur as required by applicable international and/or United States laws and regulations. In the event of violations of United States laws and regulations, the CCM shall ensure that the Government is immediately notified.

4. Conflicts pertaining to the interpretation of this ECP and its requirements (including timetables) or with respect to recommendations made by the TPA to Avin as a result of an observation, noted deficiency or Major Non-Conformity must be included in the audit report by the TPA and reported to the Government by Avin.

5. The TPA shall recommend machinery space capital improvements, equipment upgrades and replacement if existing equipment is determined to be inadequate to perform its function as per applicable Marine Environmental Protection

Requirements. The TPA shall notify the Government if it determines that Avin is uncooperative or unwilling to take reasonable action on recommendations.

6. The TPA may also perform follow-up audits for the purpose of verifying actions taken on recommendations. *See* Section VII.

7. Avin agrees to provide, and to require the TPA to provide, to the Government, their contractual agreement detailing the scope of work that the TPA will perform, and to also provide the resumes of the TPA's auditors assigned to conduct shore side and vessel audits.

8. The TPA shall produce an audit report for each vessel and shore side facility audit conducted pursuant to this ECP. Such report shall contain detailed audit findings, including the basis for each finding, and shall identify any areas of concern. TPA audit reports shall include recommendations to correct any major non-conformities, non-conformities, and observations identified. Avin shall take action on all reasonable recommendations made by the TPA. The TPA shall include information on any immediate corrective measures taken. Further, each report shall include information related to the Audit's administration and identify the following:

   a. audit scope, including the time period covered by the audit;

   b. the date(s) the on-site portion of the audit was conducted;

   c. identification of the audit team members;

   d. days/hours spent during onboard phase of the audit;

   e. identification of the company representatives and regulatory personnel observing the audit;

   f. the distribution list for the audit report;

   g. a summary of the audit process, including any comments on any obstacles encountered; and

   h. in the conclusion, whether a follow-up audit of the vessel or shore side facility is recommended within a (specified) timeframe to review corrective and preventive action taken.

9. The TPA shall submit all audit reports, in electronic form to the CAM, the Government and Avin. The TPA shall make available upon request the audit working papers and any correspondence related to the audits. The TPA shall also make hard copies of the audit reports available upon request.

10. Each audit report shall also include a narrative of any conflicts in the interpretation of ECP requirements between the auditor and Avin.

## J. TPA'S ANNUAL REPORT OF FINDINGS

1. At the conclusion of each annual round of audits, the TPA shall develop a Report of Findings summarizing the audits. A Report of Findings must be completed within 60 days of completion of each annual round of audits. A Report of Findings shall incorporate information obtained from the individual audit reports and shall provide Avin any recommendations to improve its EMS, including recommendations for follow-up audits where considered necessary.

2. If the TPA concludes it will be unable to complete its annual Report of Findings within the 60-day period, and determines that additional time will be needed to analyze available information, or to gather additional information, the TPA may request the Government to grant the TPA such additional time, as required. The Government agrees to support all such reasonable requests.

3. Avin agrees to develop and submit a response to the TPA's annual Report of Findings to the CAM and the Government for review and comment. Such response shall be due within 60 days of receipt of such Report of Findings. Avin shall provide hard copies of its response upon request.

4. If Avin concludes that it will be unable to develop and submit its response within the 60-day period, it may request the Government to grant additional time, as required.

5. The CAM and the Government will have 30 days to reply to Avin's responses to an annual Report of Findings. If the Government does not provide a reply, the response of Avin shall be deemed to **have been accepted.**

### K. Confidentiality

The TPA shall maintain the confidentiality of any non-public information made available to the TPA by Avin (whether directly or through the CAM or the Interested Parties). The TPA shall only share such information with the court, the Government, USPO, and the CAM as appropriate under this ECP. The TPA shall be responsible to ensure any party hired by the TPA to provide services under this ECP complies with this provision.

## VII. AUDITING PROCESS

### A. AUDIT PHASES

This ECP requires four phases of audits and inspections to be conducted by the TPA and CAM:

1. Initial Audits – TPA
2. Ongoing Audits – TPA
3. Final Audits – TPA, as verified by CAM
4. Internal Audit Monitoring – Avin or a qualified third party appointed by Avin.

### B. Timing and Numbers of Audits

The timing and numbers of audits shall be as follows:

1. The Initial Audits (more fully described below) shall commence after the date of sentencing and conclude by the end of the first year of probation. The Initial Audits shall include audits of the shore side operations of Avin, and 100% of the Covered Vessels at the time of the entry of the Judgment of Conviction.

2. The Ongoing Audits (more fully described below) of the Covered Vessels, shall take place during the second, third and fourth years of probation. The Ongoing Audits shall be conducted **twice** on each Covered Vessel, to include any other vessels that Defendants have assumed ownership, operation or technical management of that are required to have COFRs.

3. The Final Audits (described below) shall be conducted during the fifth year of probation. The Final Audits shall be conducted on the Covered Vessels, to include any other vessels that Avin has assumed ownership, operation or technical management of that are required to have COFRs.

4. During the term of probation, the CAM shall monitor, receive reports and be able to have input on, all of Avin's environmental internal audits as described in Sections VII and XI.

5. The audits as described herein will ensure that each Covered Vessel, consistent with this ECP, is audited at least four times during probation, depending on when they became subject to the ECP. However, should Defendants assume ownership, operation or technical management of a vessel which is required to have a COFR during the period of the probation which it would make the conducting of four audits impracticable or unduly burdensome, it shall so communicate that with the CAM and the Government. The CAM and the Government will exercise good-faith reasonable judgment to accommodate Avin's request.

### C. TPA ACCESS

The TPA shall have full access to employees and officers, company records, vessels and shore side facilities to perform its auditing function (subject to safety and security considerations).

### D. Initial Audit

1. An Initial Audit will be performed by the TPA to ascertain and evaluate all areas, including the systems, equipment, and components and current practices (whether such practices are documented or not), the knowledge, skills, and abilities of ship and shore side personnel as they relate to the requirements of this ECP, the EMS, and Marine Environmental Protection Requirements. The Initial Audit shall exceed a typical SMS audit or vetting process, and shall be used to examine practices, procedures, and equipment conditions not typically documented during a routine inspection by class society, port state or flag state inspection. The results of the Initial Audits shall be used to shape and revise as needed the EMS required by this ECP.

2. Each Initial Audit shall:

   a. be performed while the vessel is underway (typically voyages of 1 to 3 days), when systems are in operation and when personnel are performing their normal routines;

   b. assess all waste streams developed from any system, equipment and components found in any engine room or machinery space onboard the vessel, including

observations and documentation describing any apparent leakages that may contribute to bilge loading;

c. determine the status and quantify leakages stemming from:

(1) all pump and valve seals and glands during operation;

(2) all piping systems, flanges, gaskets, fittings and joints;

(3) all equipment casings including on the main and auxiliary engines and reduction gears;

(4) the operation of engines, boilers, incinerators, evaporators; and

(5) other mechanical components found aboard the Covered Vessels;

d. assess the adequacy and performance of the OWS, OCM, Incinerator, Sewage System, and any other pollution prevention equipment to handle the quantities and types of wastes developed during normal operations, including an evaluation of the capacities for all tanks or containers associated with the management of oily residues (sludge), bilge water, other oily wastes, or other wastes, and with regard to the OWS and OCM, specifically include an operational test of the system under actual operational conditions, with consideration of the manufacturer's recommendations. Such test to include an hour of continuous processing of the contents of the Bilge Holding Tank without dilution, and without dilution of the sample line leading to the OCM, conducted in the presence of the auditor(s), Chief Engineer, First Engineer, and any other engine room personnel assigned responsibility for the operation and/or maintenance of the OWS; provided that if an actual discharge is not feasible due to the location of the vessel or the levels of the Bilge Holding Tanks, then the discharge shall be through a recirculation line, in accordance with procedures approved by Class, and provided further that soundings of the Bilge Holding Tanks shall be made before and after the test and shall be made a part of the audit record, and providing that any alarms shall be recorded and made a part of the audit record, all of

the above to be recorded in the ORB, but in the event that the assessment determines that the OWS is not adequate to perform its intended function, then an immediate report shall be made to the CCM and the Government, with a copy of the engine room alarm printout to be retained and appended to the ORB page documenting the test.

e. include an evaluation of documentation tracking, maintenance, repair, and modifications of such pollution prevention equipment, and notifications of the failure of such pollution prevention equipment to shore side personnel;

f. assess each vessel's crew and its ability to handle the operational, maintenance, and repair workloads in maintaining all systems, equipment, and components onboard, and to minimize waste stream development, in particular assessing whether the size of the engineering crew is adequate for the customary workloads;

g. assess the adequacy of Avin's existing EMS, procedures, current practices, and equipment, including storage capabilities used to manage shipboard solid wastes generated in all areas of the vessel, and the effectiveness of garbage management plans;

h. assess the adequacy of Avin's existing EMS with regard to the practices and equipment associated with cargo wastes and slop management developed during the various evolutions of cargo operations;

i. assess the machinery spaces for vulnerabilities to unauthorized ways to dispose of waste, and document any methods or vulnerabilities so identified, specifically, assess whether the vessel is fitted with a duct keel, or equivalent space, and whether the duct keel has been used for the storage of oily water;

j. assess the adequacy of the vessel's crewmembers to maintain the following records, as applicable, including a thorough comparative analysis of recorded values (against each other where possible):

(1) Oil Record Book;

(2) Engine Room alarm records;

(3) Tank sounding sheets;

(4) Personnel work records and lists;

(5) Maintenance records;

(6) Vendor service records;

(7) Oily bilge water and oil residues (sludge) receipts;

(8) Deck Log;

(9) Garbage Record Book;

(10) Oil to Sea Equipment Interface records;

(11) Hazardous waste manifests;

(12) Solid waste discharge receipts;

(13) OCM calibration records;

(14) Training records;

(15) Vetting documents;

(16) Inspection Documents; and

(17) EMS or internal audit documents;

k. assess the adequacy of the policy, procedures, and current practices used to store and dispose of the following, if applicable:

(1) Solvents;

(2) Degreasers Cleaning wastes;

(3) Batteries;

(4) Paints;

(5) Oily rags;

(6) Fluorescent and incandescent bulbs;

(7) Expired boiler and engine chemicals;

(8) Used boiler and engine chemicals;

(9) Galley greases;

(10) Pyrotechnics;

(11) Medical supplies;

(12) Contaminated bunkers;

(13) Used Oils and greases;

(14) Incinerator ash;

(15) Transformer oils;

(16) Contaminated refrigerants; and

(17) Hazardous materials;

l. assess and evaluate documentation showing whether all vessel officers understand the requirements of the EMS;

m. assess the EMS and current practices and procedures associated with the Master and Chief Engineer's capability to communicate regarding issues relating to the EMS with shore side personnel including the CCM and other appropriate managers as required, and review such communications;

n. assess the frequency and adequacy of shipboard pollution prevention and environmental protection meetings and training through interviews of crewmembers and review of records;

o. assess the current practices and procedures used on the vessel and ashore to track crewmember environmental training, and the availability of, and access to, training resources on board and ashore;

p. assess the adequacy of reference materials related to each environmental procedure required by this ECP, the EMS and other maritime environmental protection requirements;

q. assess the adequacy of existing reporting methods to report environmental concerns through a user-friendly system

and evaluate whether a reporting individual may remain anonymous; further reviewing processes for handling reports of environmental concerns made by crewmembers and shore side personnel; also evaluate the adequacy of signage and instructional material posted onboard the vessel relevant to availability and use of the existing reporting methods;

r. assess the applicable EMS to ensure that vessel vendors, technicians, and other non-crewmembers are encouraged to follow requirements regarding pollution prevention and environmental protection;

s. assess any existing Environmental Tag System ("ETS") tracking and valve locking program including the storage of environmental tags, and the prevention of the use of duplicate environmental tags;

t. assess the EMS procedures and the equipment used to maintain refrigeration units, including the availability and status of refrigerant recovery units, the procedures for recovering refrigerants, and the maintenance of a refrigerant leak log;

u. assess the EMS procedures and equipment related to oil transfer procedures, including slops, bilges and sludge discharges, conditions of hoses, connections and transfer equipment, including reviews of Declarations of Inspections, and methods in place to prevent illegal discharges via the shore connections;

v. assess the EMS procedures and the equipment used to handle emergency releases of hazardous fluids or pollutants on deck or within machinery spaces of the vessel, including a review of the Shipboard Oil Pollution Emergency Plan and an evaluation of the capabilities of personnel performing such duties;

w. assess all records related to any failure of existing safety or other management systems, including a review of nonconformities and respective corrective actions;

x. assess the EMS procedures associated with ballast water management and anti-invasive species requirements;

y. assess the EMS procedures addressing compliance with the EPA's VGP;

z. assess the availability and content of various manuals, schematics and documents required in the use of all pollution prevention equipment and activities.

**E. Ongoing Audits**

Ongoing Audits will consist of all the elements of the initial audit and any additional requirements created during the revision of the existing EMS and the implementation of updates to the EMS. In the event that any deficiencies are noted during an Ongoing Audit, Avin must manage a feedback system that communicates the deficiency to the relevant persons and monitors the correction of the deficiency. Such feedback system must be amenable to an audit.

The audits may take place overseas, and/or during coastwise voyages. To achieve the objectives of this ECP, the audits shall take place while the vessels are underway; however vessels may be audited in port or at anchor if, in the discretion of the TPA, doing so is necessary, including if the long-haul voyage schedules of Covered Vessels makes underway audits impractical. The TPA shall notify the Government if it is unable to conduct underway audits.

**F. Final Audits**

The Final Audits shall be performed by the TPA take place during the fifth year of probation and shall also be performed in the same manner as the Initial and Ongoing Audits. The Final Audits shall also assess Avin's full implementation of its updated EMS and evaluate, for the Government, Avin's capability to ensure and sustain compliance with the requirements of this ECP, the EMS, and other Marine Environmental Protection Requirements. The CAM shall provide independent verification of the status of Avin's compliance with this ECP. The content of the Final Audits shall be as described in this Section VII.

**G. Deficiencies/Non-Conformities**

A deficiency or non-conformity is any violation of Marine Environmental Protection Requirements and the additional requirements and policies established by this ECP. Audit reports shall identify and explain in narrative form all deficiencies noted during the audit process. If appropriate, a recommendation may be developed by the TPA or CAM for any deficiency noted.

**H. Major Non-Conformities**

1. In the context of this ECP and the work of the TPA, a Major Non-Conformity is a violation of Marine Environmental Protection

Requirements or requirements and policies established by this ECP that consists of or contributes to the discharge or potential discharge of unpermitted garbage, oil, oily wastes or other prohibited wastes. It may also include the discovery of pollution prevention equipment determined to be inadequate in terms of processing and monitoring capabilities or inadequate with respect to the quantities of wastes such equipment may be required to process. It may also include evidence that any crewmember has acted in any way to circumvent pollution prevention equipment or a Marine Environmental Protection Requirement.

2. In the event of the determination of a Major Non-Conformity, the TPA shall make immediate notifications to Avin, the CAM and the Government. The CAM shall also immediately notify Avin and the Government if it discovers a Major Non-Conformity during a Final Audit. Such notification may include a recommended course of action.

The CCM shall establish and provide a corrective action plan for any deficiencies, taking into account any recommendations received from the TPA or CAM. Avin shall address immediately any Major Non-Conformities. Corrective action shall be taken with regard to deficiencies within 60 days from identification of the issue. The CCM shall report annually on the status of implementation of each corrective action to the Government and to the CEO.

## VIII. ENGINEERING REQUIREMENTS

### A. Time of Implementation

Unless otherwise stated, all of the Engineering Requirements set forth below shall be implemented on Covered Vessels as soon as practicable, as determined by the CCM, and not later than one year from the date of sentencing.

### B. Environmental Tag System

1. Avin shall continue to implement an ETS to prevent unauthorized usage or connections within the engine room and machinery spaces. Under the ETS, Avin shall require crew members to use numbered seals to prevent the unauthorized connection to, and discharge through, piping systems that are or may be connected to a machinery space or other bilge system.

2. The ETS seals shall be non-reusable and uniquely numbered. An ETS Seal Log shall be maintained by the Master and Chief Engineer that records each time a seal is affixed or removed, including the date, time, seal number removed, seal number

affixed, personnel involved, and reason for any seal removal/replacement.

3. Any existing seals that are found to have deteriorated or had their numbers partially/completely erased shall be replaced immediately, with the reason for replacement entered in the Seal Log.

4. The Master of each Covered Vessel shall retain the replacement environmental tags under his/her control in a secure location. The CCM will be responsible for ensuring that no duplication of ETS seal numbers occur and will maintain a master tracking document indicating which series of environmental tags have been supplied to each Covered Vessel.

**C. Bilge-Main Cross Connections**

1. Avin shall immediately notify Covered Vessels regarding the prohibition against using cross connections from engine room bilge mains to the suction piping of larger pumps which may be referred to as the "fire and general service pump" or "fire, bilge and ballast" pump. The notification shall state that the usage of these crossovers is similar to bypassing the OWS equipment and is strictly prohibited. Cross connections to eductor systems or any other system capable of pumping out bilge and wastes will also be referenced.

2. The deck plates above or near the locations of these cross connections or other interconnected systems and the valve bodies and associated hand wheels shall be painted international orange. A brightly colored sign with three inch letters shall be permanently fixed nearby, stating: "Bilge System Piping Crossover - Emergency Use Only."

3. To prevent unauthorized usage of those valves, Avin shall require that ETS tags be placed on such valves. The ETS Seal Log shall track any time a crossover to the bilge main is opened. If the valves are remotely operated from the engine control room, the associated push button must be unable to be used without breaking an environmental tag. A suitable sign must be posted near the associated push buttons or switches providing restrictive language similar to that above (Section C.2.) as to its use.

### D. Emergency Bilge Suctions

All other bilge suction valves not connected to the bilge main, and independent emergency suctions to the vessel's engine room bilges like those which may be connected to sea water circulating pumps, shall be painted brightly and labeled in a manner similar to "Emergency Bilge Suction - Emergency Use Only." The valve wheels will also have a numbered and logged ETS tag capable of breakaway during emergencies, testing, and maintenance. In addition to the ETS Seal Log, the applicable ETS tag numbers shall be recorded in the official Engine Log Book, which Log Book shall include explanations for breakage or replacement of any ETS tags.

### E. Blank Flanges

1. To prevent unauthorized connections within the engine room and machinery spaces of Covered Vessels, every blank or potentially removable flange associated with any piping leading overboard, on systems such as salt water service, main engine raw water cooling or other systems, shall be permanently secured, removed, or fitted with numbered ETS tags through the flange bolts that will break when such bolts are removed, to prevent unauthorized connections and discharges. The ETS tags used shall be numbered and records kept in the ETS Seal Log. Alternative sealing methods, such as numbered foil-coated sticker seals for flanges, may be considered.

2. The blank flange securing the bilge and sludge transfer system shore connection discharge valve at the discharge stations shall also require a numbered ETS tag. The applicable ETS tag numbers shall be recorded in the ETS Seal Log.

### F. Bilge Sampling and OWS Performance Analysis

1. Avin agrees that, as part of the audits, the auditor shall oversee the drawing of samples from the machinery space(s) bilge, the OWS, and the Bilge Holding Tank. In consultation with the TPA or CAM, Avin shall contract with a company providing sampling and analysis services. Prior to its appointment, the TPA will review and approve the sampling protocols provided by this company, including the protocols covering the drawing, securing, labeling, shipping, and other components of the custody transfer chain. The purpose of the sample collection shall be to take samples that adequately represent the common fluids and contaminates that may accumulate. No attempt should be made to collect a clean sample only.

2. The samples shall be forwarded to an appropriate lab at Avin's cost, for a content analysis. The analysis of the representative samples will be provided to the TPA, the CAM, and the manufacturer of the applicable OWS found onboard the vessel from which the sample was taken.

3. Avin shall work cooperatively with OWS manufacturers to verify the equipment's capability to process fluids having the content found in the samples.

**G. Ship Source Pollution Research and Development Project**

1. Avin agrees that to the extent funding is provided by the Government, it will assist and make Covered Vessels reasonably available as test platforms for prototype equipment testing and other research purposes during the probationary period; provided that the testing or research can be done safely and without delay to the vessels' schedules, and subject to authorization from vessel owners and charterers.

2. The intellectual property rights from any technology developed by such research may be allocated by whatever agreement is reached between the research institute and Avin. However, the research partnership shall make all resulting reports publicly available for the benefit of the maritime community, but neither the Defendants' names nor the vessel's name may be included in any publicly available document.

**H. Additional OWS / OCM Requirements**

1. The sample line from the OWS discharge connection to the sample/flush line control valve will be painted a bright color to distinguish it from other tubing and piping in the area. The line must be routed so it is clearly visible to the extent possible for its entire length. No additional connections or tees of any kind may be added to the line.

2. The end connecting to the OWS discharge pipe may be fitted with a manual valve or petcock, or tamper proof automatic valve. The tube end fittings and the valve handle must be fitted with a numbered seal that will break if the valve is closed, removed, or if the tubing connection nut is loosened. The end nearest the sample/flush line control valve and any tubing in between the control valve and the OCM will be similarly protected to prevent any disassembly of the sensing system.

3. Avin shall perform testing that ensures that the OCM requires a sample flow for normal operation and control. Any OCM that allows the OWS to function normally without sample flow is prohibited unless all valves from the OWS discharge to the sample/ flush line control valve are removed. Avin shall ensure that every Covered Vessel's OWS is configured and capable of being fully operationally tested in port with the skin valve closed.

4. Every Covered Vessel shall perform monthly operational tests of the OWS and OCM in accordance with manufacturer's instructions. The test shall be logged in the vessel's ORB and the vessel's Master shall send a report to the CCM.

5. Every Covered Vessel shall conduct an annual operational test of the OWS system under actual operational conditions, with consideration of the manufacturer's instructions, such test to include an hour of continuous processing of the contents of the Bilge Holding Tank without dilution, and without dilution of the sample line leading to the OCM,[1] conducted by the Chief Engineer in the presence of a Avin's Superintendent, Second Engineer, and any other engine room personnel assigned responsibility for the operation and/or maintenance of the OWS; provided that if an actual discharge is not feasible due to the location of the vessel or the levels of the Bilge Holding Tank, then the discharges shall be through a recirculation line, in accordance with the procedures approved by Class, and provided further that soundings of the Bilge Holding Tank shall be made before and after the test and shall be made a part of the test record, and providing that any alarms shall be recorded and made part of the test record, all of the above to be recorded in the ORB, but in the event that the assessment determines that the OWS does not have adequate capacity to process the volume of bilge water generated by the vessel, , then an immediate report shall be made to the CCM, the TPA, and the CAM, with a copy of the engine room alarm printout to be retained and appended to the ORB page documenting the test.

6. Every Covered Vessel shall inspect and, if necessary, clean, the OWS source tanks and remove any accumulated oil at least once every 6 months. Such inspections and cleaning shall be logged in the ORB and signed by the officer(s) in charge of the operation.

---

[1] A test performed where the source tank is diluted with water or does not contain a representative sample of bilge water is strictly prohibited.

### I. Record Keeping

All Sounding Records (including draft records or forms used when taking soundings) and Logs required by this section shall be maintained onboard the vessel during probation. All Engine Room alarms, including printouts (if there is a printing capability onboard) and records shall also be maintained on board during probation.

### J. Oil Record Book Entries

Entries made into the ORB shall be made and signed by the officer or officers in charge of the operation and shall be countersigned by the Chief Engineer. Each page shall be signed on completion at the bottom, by the vessel's Master.

### K. Tank Sounding Record Book

Avin shall require vessel personnel to sound all waste, sludge and bilge tanks, and/or oil residues (sludge) at least daily. The entries in the Tank Sounding Record Book shall be initialed by the person who took the reading. The Tank Sounding Record Book must have numbered pages. It shall be maintained in the engine control room and made available during all inspections and audits required by this ECP. If the person taking the sounding uses a scrap piece of paper (or other physical recording medium) while conducting the soundings, that piece of paper must be appended to the Tank Sounding Record Book. The Government is aware that a Tank Sounding Record Book is a working document and may be dirty.

### L. Oil-to-Sea Interfaces

1. Avin shall have a standard system for monitoring equipment having oil-to-sea interfaces. Such interfaces may include oil lubricated stern tubes, bow or stern thrusters, stabilizers, hydraulically operated controllable pitch propellers, and similar equipment whereby the leakage of a sealing component may cause a loss of oil into the waters surrounding the vessel. Any replenishment of oil into the head tanks, operating systems reservoirs or other receivers associated with this equipment shall be logged, regardless of the quantity involved. Any ingress of water or drainage of water into or from these systems must also be logged.

2. When known, an explanation of the loss of oil shall be provided, along with the dates and time the loss occurred and the signature of the engineer that identified the loss. Routine stern tube lube oil loss must be logged and reported immediately on each occasion. If any Chief Engineer fails to promptly and accurately report such conditions, Avin shall investigate and take

appropriate disciplinary action, which may include termination of employment, subject to applicable laws.

**M. Fleet Engineering Survey**

1. Within 6 months of entry of the Judgment, Avin shall survey all shipboard engineers on its vessels, at all levels, for information on how to make the OWS, OCM, and associated systems and waste management processes tamper-proof, and for recommended methods on reducing or handling waste accumulations within machinery spaces or pump rooms. An assessment requesting the frank opinions of the vessels' engineers as to their ability to adequately maintain the vessels' systems, equipment, and components will be included. The survey will also address the discharge of garbage, how much garbage can reasonable be presumed to be accumulated during a typical voyage, and how to eliminate the discharge overboard of unpermitted garbage. The survey will emphasize non-retaliation for open and honest opinions and reports of current non-compliant circumstances.

2. The CCM and the CCM's staff shall evaluate the responses and establish a plan to evaluate, test and implement viable tamper-proofing solutions, methods to reduce and handle waste accumulations. The CCM shall also address all maintenance concerns suggested by the vessels' engineers. A summary of the reported information and corrective actions will be provided to the CAM and the Government.

## IX. TIME REQUIREMENTS – SUBMITTAL OF ENVIRONMENTAL MANAGEMENT SYSTEM

**A. Updated Environmental Management System**

Avin shall implement an updated EMS as more fully described in Attachment 2. To the extent not already covered, the updated EMS will include and address the following:

1. Environmental Policy;

2. Environmental requirements and voluntary undertakings;

3. Objectives and targets;

4. Structure, responsibility and resources;

5. Operational controls;

6. Corrective, preventative action and emergency procedures;

7. Training, awareness and competence;

8. Organizational decision making and planning;

9. Document control; and

10. Continuous evaluation and improvement.

### B. Obligation to Submit Copies of EMS

Avin shall submit copies of its updated EMS to the CAM and the Government not later than 18 months before the end of the probationary period.

### C. Comments on EMS

The CAM and the Government may provide comments on the updated EMS within 60 days of receipt unless additional time for review is requested in writing. Avin shall submit a written reply, as appropriate, within 30 days of receipt of any comments provided. If no comments are received from any of the aforementioned parties, the EMS shall be considered to be acceptable, subject to the results of subsequent audits (*See* Section X(C) below).

### D. Obligation to Submit Proposed EMS Revisions

If the Final Audit Report produced by the CAM recommends substantial revisions to the EMS, Avin shall submit proposed revisions to the EMS to the Government for review.

### E. Review of Proposed EMS Revisions

The CAM and the Government may review the proposed revisions and make a recommendation to the Court as to its acceptance of the proposed revisions to the EMS.

## X. CHANGES IN OWNERSHIP AND OPERATION

### A. Notification of Changes

Avin agrees that it will immediately notify the CAM and the Government of any change in name, flag of registry, recognized organization, ownership, or class society of any Covered Vessel. Avin shall also promptly provide the names of any additional vessels that, during the period of probation, it assumes ownership, operation or technical management of that are required to have COFRs. The term

"acquire" as used in this Section includes when Defendants assume a significant ownership interest or operation of a vessel. It does not include a vessel that Defendants have chartered that is owned and operated by third-party companies that have no financial relationship with Avin or its affiliated companies.

**B. Acquiring Additional Vessels**

1. When additional vessels are acquired by Defendants, such vessels shall become subject to this ECP if they are required to have COFRs.

2. New Buildings – Avin shall perform a waste stream analysis on each class of new vessel buildings intended to be Covered Vessels. As soon as practicable, and to the extent possible, Avin shall ensure a balance between the estimated waste stream generated and the capacity of the vessel's waste disposal equipment to properly dispose of waste generated by the vessel. Once acquired by Defendants, a vessel may be subject to an Initial Audit, Ongoing Audit, or Final Audit, depending on the year of the probation period in which it is acquired if it is required to have a COFR.

3. Additional Vessels – Except in the case of a Fleet Acquisition, when Defendants acquire a vessel that is required to have a COFR, Avin shall perform an Internal Audit (using the criteria for an Initial Audit) of the environmental capabilities of each newly-acquired vessel within 60 days of acquisition. Based upon the stage of probation when such vessels are acquired, Initial, Ongoing and Final audits may also be required, as described in Section X.

4. Vessels of Less Than 300 Gross Tons – Notwithstanding the above requirements, Avin shall exercise its best efforts to fully implement this ECP on any Covered Vessel of less than 300 gross tons, but may employ modified procedures as suitable based upon the size of such vessels. Avin shall notify the Government of any such vessel(s) to which such modified procedures apply and of the nature of such modified procedures. Such required notifications shall be made to the Government within 60 days of acquisition of such vessel.

5. Fleet Acquisitions

    a. For the purpose of this ECP, a "fleet" is defined as 5 or more vessels.

b. If Defendants acquire a fleet during the probationary period that will be required to have COFRs, Avin shall perform an Internal Audit, using the Initial Audit requirements of Section VII of this ECP, on all vessels in the newly acquired fleet within 180 days. Upon completion of such Internal Audits, the TPA shall conduct audits on at least 50% of the new fleet in accordance with, and subject to, the requirements of Section VII.

6. Avin agrees that this ECP and its requirements shall remain in effect for all Covered Vessels, regardless of changes in the vessels' flag of registry, recognized organizations, name, or class society. Avin shall notify the CAM and the Government when any vessel is released from the requirements of the ECP due to a legitimate change in ownership, operation or technical management.

## XI. SELF-ENFORCEMENT

### A. Self-Enforcement Procedures

Avin agrees that it will undertake and implement the necessary procedures to ensure that the officers and crew of each Covered Vessel, and all shore side employees, managers, and other employees involved with the operation, maintenance, or repair of the Covered Vessels diligently comply with this ECP and the associated requirements in their entirety. Among other efforts, Avin shall establish internal auditing procedures using the criteria established in this ECP.

## XII. SCHEDULE

### A. Requirement to Comply With Schedule

Avin shall comply with the requirements of this ECP, including the dates and periods mentioned herein. Should Avin be unable to comply with any of the deadlines herein, Avin shall immediately notify the CAM and the Government.

## XIII. REPORTS AND COMMUNICATIONS

### A. Submission of Documents

As described in Section I(G), the submission of all reports, audits, and other documents pursuant to this ECP, to any party or governmental interest, must be made, to the maximum extent practical, in an electronic form. Avin shall communicate with the TPA, CAM and the Government about what methods of submission of this electronic data will be most practical given that each of these parties may have differing network capabilities and restrictions. Avin, the TPA and

the CAM will provide to the Government paper copies of any submission or documents pursuant to this ECP upon request.

## XIV. ACKNOWLEDGEMENT

Defendants have read this ECP carefully and understand it thoroughly. Defendants enter into this ECP knowingly and voluntarily, and agree to abide by its terms. By signing below, the corporate representatives agree that such representatives have been duly authorized by Defendants' BODs pursuant to the same notarized legal document filed in *United States v. Avin International Ltd. et al.* (Crim. No. 24-_____), certifying that Defendants are authorized to enter into and comply with all of the provisions of the Plea Agreement and this ECP.

For the United States:

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

By:____________________________
Kenneth E. Nelson
Senior Trial Attorney
Environmental Crimes Section

______________________________
Lauren D. Steele
Trial Attorney
Environmental Crimes Section

PHILIP R. SELLINGER
United States Attorney
District of New Jersey

By:____________________________
Joseph Stern
Assistant United States Attorney

ROGER B. HANDBERG
United States Attorney
Middle District of Florida

By:____________________________
John Cannizzaro
Assistant United States Attorney

On behalf of Defendant Avin International Ltd, I have been authorized by a corporate resolution to sign the Plea Agreement, including this ECP, and bind Avin International Ltd. Avin International Ltd has been advised by its attorneys of its rights, of possible defenses, of the applicable Sentencing Guidelines provisions, and of the consequences of entering into the Plea Agreement, including this ECP. Avin International Ltd voluntarily agrees to all of the terms of this Plea Agreement, including the ECP. No promises or inducements have been made to Avin International Ltd other than those contained in the Plea Agreement. No one has threatened or forced Avin International Ltd in any way to enter into the Plea Agreement. Avin International Ltd is satisfied by the representation of its attorneys in this matter.

Gregory F. Linsin
Authorized Representative

On behalf of Defendant Kriti Ruby Special Maritime Enterprise, I have been authorized by a corporate resolution to sign the Plea Agreement, including this ECP, and bind Kriti Ruby Special Maritime Enterprise. Kriti Ruby Special Maritime Enterprise has been advised by its attorneys of its rights, of possible defenses, of the applicable Sentencing Guideline provisions, and of the consequences of entering into the Plea Agreement, including this ECP. Kriti Ruby Special Maritime Enterprise voluntarily agrees to all of the terms of the Plea Agreement, including the ECP. No promises or inducements have been made to Kriti Ruby Special Maritime Enterprise other than those contained in the Plea Agreement. No one has threatened or forced Kriti Ruby Special Maritime Enterprise in any way to enter into the Plea Agreement. Kriti Ruby Special Maritime Enterprise is satisfied by the representation of its attorneys in this matter.

Gregory F. Linsin
Authorized Representative

I am counsel for Avin International Ltd and Kriti Ruby Special Maritime Enterprise and have discussed every part of the Plea Agreement, including this ECP, with authorized representatives of Avin International Ltd and Kriti Ruby Special Maritime Enterprise. Further, I have fully advised the authorized representatives of Avin International Ltd and Kriti Ruby Special Maritime Enterprise of their rights, of possible defenses, of the applicable Sentencing Guidelines provisions, and of the consequences of entering into the Plea Agreement. To my knowledge, the decisions of Avin International Ltd and Kriti Ruby Special Maritime Enterprise to enter into this Plea Agreement are informed and voluntary.

Kierstan L. Carlson, Esq.
Blank Rome LLP
Counsel for Defendants
Avin International Ltd
Kriti Ruby Special Maritime Enterprise

November 5, 2024
Date

**ATTACHMENT 1**

**Vessels covered by this Environmental Compliance Plan**

| Name of Vessel | IMO Identification Number |
|---|---|
| KRITI STATE | 9324289 |
| KRITI RUBY | 9391282 |
| KRITI BAY | 9418573 |

# ATTACHMENT 2

## Environmental Management System

Avin must maintain ISO 14001 certification for each of their offices engaged in the operation or technical management of Covered Vessels. The CCM shall be responsible for maintaining the EMS certified to ISO 14001/2009 standards and in a manner which addresses the following elements:

### <u>Environmental Policy</u>

The EMS should be based upon a documented and clearly communicated policy. Such policy should set out Avin's commitment to a cleaner marine environment. It should include:

- provision for compliance with environmental requirements;
- commitment to continuous improvement in environmental performance, including those areas required by this ECP;
- commitment to pollution prevention that emphasizes source reduction, to include funding and human resources necessary to effectively maintain and repair the systems, equipment and components found in machinery spaces of vessels;
- commitment to continuous reduction of environmental risks; and
- commitment to sharing information with external stakeholders on environmental performance.

### <u>Environmental Requirements and Voluntary Undertakings</u>

The EMS must provide a means to identify, explain and communicate all environmental requirements and voluntary undertakings to all employees and to all vendors, technicians, and other non-crewmembers whose work could affect Avin's ability to meet those requirements and undertakings.

Environmental requirements include statutes, regulations, permits, and agreements such as this ECP. Voluntary undertakings include the adaptations of additional best practices or industry norms that Avin may choose to adopt.

The EMS must include procedures for ensuring that the organization meets such environmental requirements, voluntary undertakings and the additional requirements of this ECP. The EMS must also specify procedures for anticipating changes to environmental requirements, including new requirements that may apply as a result of changes in operations and incorporating these changes into the EMS.

**Objectives and Targets**

The EMS will establish specific objectives and targets for:

- achieving and maintaining compliance with all Marine Environmental Protection Requirements and the requirements of this ECP;
- training, educating and fostering among all shipboard and shore side personnel the need for solid environmental stewardship through a conscious effort at pollution prevention and accurate recordation of shipboard evolutions;
- environmental performance demonstrating continuous improvement in regulated and non-regulated areas;
- pollution prevention that emphasizes source reduction with respect to machinery space waste streams and effective management of cargo related wastes; and
- Sharing information with external stakeholders on environmental performance against all EMS objectives and targets.

The EMS must establish appropriate time frames to meet the foregoing objectives and targets. The time frames must be documented and updated as environmental requirements change, or as modifications occur in activities and structures within organizations that may affect environmental performance, or as a result of recommendations made by the TPA.

**Structure, Responsibility and Resources**

Avin will ensure that it has sufficient personnel and other resources to meet its objectives and targets. The EMS will describe in detail the procedures and steps for achieving those objectives and targets. The EMS will define the compliance roles and responsibilities of all vessel and shore side personnel involved with the operation, maintenance, and repair of Covered Vessels, and will indicate how they and other corporate personnel will be held accountable for achieving and maintaining compliance with this EMS, the requirements of the ECP, and other Marine Environmental Protection Requirements. Additionally, it will describe how environmental performance and compliance information will be communicated to all vendors, technicians, and other non-crewmembers onboard the Covered Vessels. The EMS will also establish procedures for receiving and addressing concerns raised by these personnel regarding environmental performance and compliance.

**Operational Control**

The EMS will identify and provide for the planning and management of all Avin's operations and activities, with a view to achieving the EMS objectives and targets. For example, vessel deck department, pump room, and machinery space maintenance

and repair will be an important aspect in achieving and maintaining compliance and enhancing environmental performance.

**Corrective and Preventive Action and Emergency Procedures**

Avin, through its EMS, will establish and maintain documented procedures for preventing, detecting, investigating, and reporting (both internally and externally), any occurrence that may affect the organizations' ability to achieve the EMS objectives and targets, and for promptly initiating corrective action.

Such measures must focus particular attention on incidents that may have an effect on compliance with environmental requirements, as well as on environmental performance in regulated and non-regulated areas, including requirements of this EMS, the ECP or other Marine Environmental Protection Requirements. Examples of such situations include incinerator or OWS malfunctions, overflows of tanks within machinery spaces, fuel oil, lube oil, or saltwater line failures, operator errors and other accidental releases.

The EMS must also establish documented procedures for mitigating any adverse impacts on the environment that may be associated with accidents or emergency situations, and for ensuring that similar incidents are avoided. The EMS must include procedures for tracking any preventive and corrective actions that are taken. If the environmental violation or incident resulted from an identified weakness in the system, the EMS should be updated and refined to minimize the likelihood of such problems recurring in the future. The EMS should also, to the extent possible, provide for the testing and evaluation of emergency procedures.

**Training, Awareness and Competence**

The EMS must establish procedures to ensure that all personnel (including vendors, technicians, and other non-crewmembers) whose job responsibilities affect the ability to achieve the EMS objectives and targets, have received sufficient notification and/or familiarization regarding the EMS requirements to enable such persons to meet their specific EMS responsibilities. In particular, the training and/or familiarization should enable such personnel to be aware of, and comply with, environmental requirements specific to their duties under the EMS and this ECP and other Marine Environmental Protection Requirements. Additional training requirements are set forth in Attachment 3.

**Organizational Decision-making and Planning**

The EMS must describe how these various Management System elements will be integrated into the organizations' overall decision-making and planning, in particular, decisions on capital improvements or recommendations on capital improvements, training programs, vessel operations, and maintenance and repair

activities. Specific information shall be provided relating to the additional resources and oversight required of older vessels within its fleet.

**Document Control**

The EMS must establish procedures to ensure maintenance of appropriate documentation relating to its objectives and targets and should also ensure that those records will be adequate for subsequent evaluation and improvement of the operation of the EMS. Additionally, it must document the organizations' state of compliance with Marine Environmental Protection Requirements and the requirements of the ECP. All records will be maintained and made available to the TPA, and Port and Flag State Personnel.

**Continuous Evaluation and Improvement**

The EMS must include methods to perform periodic, documented and objective auditing of the organizations' performance in achieving these objectives and targets and on how well the EMS assists the organization in achieving those objectives and targets. This requirement is independent from the auditing requirements detailed elsewhere in this ECP. The goal of such internal audits and reviews will be to allow management to continuously monitor and access vessel systems, equipment and components, and the ability and proficiency at which vessel crew members and personnel ashore comply with the policies and procedures established by the EMS.

Additionally, the EMS will:

- identify an ongoing process for assessing operations for the purposes of preventing and controlling or minimizing waste stream development and releases, ensuring environmental protection, and maintaining compliance with a primary emphasis on marine engineering, vessel machinery space systems, equipment and components and any shipboard systems having oil-to-sea interfaces, including criteria for when a vessel is to be taken out of service for an environmental discharge-related repair such as when caused by leaking stern tubes, thrusters or other equipment;
- include organization charts, as appropriate, that identify shore side and vessel individuals having environmental performance, risk reduction, and regulatory compliance responsibilities, and specify responsibilities of Marine and Technical Superintendents to report information related to environmental releases or inadequate performance of environmental pollution protection equipment, system casualties resulting in internal spills, excessive waste development and leaking equipment with oil-to-sea interfaces;
- promote non-retaliatory practices and ensure that employees are not punished or otherwise suffer negative consequences for reporting violations of environmental laws, regulations, or policies, and describe potential consequences for departure from specified operating policies and procedures,

including possible termination of employment, and liability for criminal/civil/administrative penalties as a result of noncompliance;

- make employee compliance with environmental policies of this ECP, the EMS and other Marine Environmental Protection Requirements a positive factor, and failure to comply a negative factor, in all evaluations undertaken for the performance of all its employees;
- include policies against any incentive or bonus programs based on minimizing operational costs associated with the operation, maintenance and repair of machinery space systems, equipment and components, to ensure that employees do not avoid such costs and thereby sacrifice environmental compliance;
- describe a confidential non-compliance reporting system that is adopted to ensure that employees may quickly and confidentially report discharges, spills, environmental incidents and other environmental performance data;
- identify all operations and activities where documented standard operating practices (SOPs) are needed to prevent potential violations or unplanned waste stream releases, with a primary emphasis on marine engineering, vessel engine room and machinery space operations, systems, equipment and components, including the development of SOPs and the manuals described in Attachment 4;
- identify the types of records developed and maintained in support of the ECP and the EMS, such as reports, audit working papers, correspondence, communications, and reports from the confidential system for non-compliance reporting, identify personnel responsible for their maintenance, and identify procedures for responding to inquiries and requests for release of information;
- provide a system for conducting and documenting routine, objective, self-inspections by Avin's internal auditors, supervisors and trained staff to check for malfunctions, deterioration, and inadequate maintenance of pollution prevention equipment, worker adherence to SOPs, unusual situations, and unauthorized releases; and
- identify a dedicated funding source which is rapidly and easily accessible for necessary expenditures for personnel training, parts inventory and ordering, and maintenance of pollution prevention equipment.

## ATTACHMENT 3

### Employee Training Program

(1) The CCM will be responsible for ensuring there are training programs in place to educate and train vessel and shore side employees associated with the technical management of the Covered Vessels. The CCM shall name a Company Training Manager to ensure that the requirements of this section are met.

(2) Training shall occur annually. Training may be performed by qualified instructors at a training facility or on company premises or manning agents premises or through Computer Based Training. Crew members shall receive such training before signing on board a Covered Vessel, or if unable to receive such training beforehand, within 7 days of signing on board. Existing shore side employees associated with the technical management of the Covered Vessels must receive such training within 6 months of the commencement of the probationary period. New shore side employees associated with the technical management of the Covered Vessels hired after 6 months from the commencement of the probationary period must receive such training before the employee assumes his or her duties.

(3) The training shall include pertinent sections of this ECP, the EMS, and existing Marine Environmental Protection Requirements and discussion of the consequences to Avin and its employees for failure to comply with the requirements of this ECP.

(4) The training for crewmembers and Superintendents shall include shipboard-related technical and practical information associated with pollution prevention and the operation, maintenance of pollution prevention equipment and systems as appropriate for the work responsibilities and department in which an employee works.

(5) The training shall also include instruction regarding:

- Corporate environmental compliance structure, including the CCM and contact information;
- Comprehensive overview of this ECP, the EMS, and other Marine Environmental Protection Requirements;
- The reporting system used to report non-compliance;
- Sanctions and consequences for violations such as remedial training, suspension, termination, and civil and criminal liability;

- Pollution prevention and minimization programs specifically relating to steward, deck, and engine department procedures and operations;
- All requirements set forth in the Engineering section of this ECP;
- Position specific training in the operation, maintenance and repair of OWS, incinerators and other pollution prevention equipment;
- Procedures for solid and hazardous waste segregation and storage, disposal, and reporting of releases; and
- All other shipboard environmental protection related procedures examined and described in Section VII of the ECP.

(6) A basic initial training program shall be provided to vessel employees currently onboard Covered Vessels at the time the plea is entered in an effort to promptly mitigate pollution risk and ensure environmental protection. Employees must also receive the full instruction described in the preceding paragraph prior to returning to a vessel on a new contract.

(7) The Company Training Manager will maintain a catalog that provides an overview of the training courses; identifies the person responsible for delivering the training; and establishes a tracking system to monitor the type, frequency and successful completion of training.

(8) The CCM shall provide the TPA with details of environmental training courses provided to their officers and crew at establishments ashore, along with their annual schedule. The TPA shall be required to conduct a review of such courses at a minimum of one training establishment per year during the Initial and Ongoing phases, provided that courses at all the training establishments are reviewed at least once during the first two years of the probation period.

(9) During the Final phase, the TPA shall conduct a review of training courses offered at the location with the highest number of students, representing the nationality that forms the majority of Avin's shipboard crew.

## ATTACHMENT 4

### Bilge, Sludge, Sewage & Hazardous Materials

In addition to the requirements set forth in Attachment 2, the following subjects shall be addressed in the EMS:

**Bilge Water and Sludge Management:**[2]

- describing Avin's policy and detailed procedures regarding management, disposal and discharges, including the identification of persons responsible for shipboard environmental compliance;
- describing applicable ECP and EMS requirements, domestic and international laws, regulations and standards (including applicable portions of the United States Code of Federal Regulations ("CFR"), other pertinent pollution laws and regulations, MARPOL regulations, and standards);
- describes reporting requirements (including internal and external reporting requirements relating to spills and discharges);
- containing a general overview of the engineering requirements of this ECP and addressing bilge water, oily wastes, sludge systems equipment and components. This shall also include manuals for incineration, separation and monitoring equipment and system schematics and routine, daily and preventative maintenance and the identification and required inventory of all critical spare parts;
- describing fundamentals and maritime practices of waste stream minimization including engine room housekeeping, minimization of bilge loads and leakages, use of proper cleaning chemicals, and prevention of sewage and black water spills into bilge tanks in accordance with the requirements of this ECP, the EMS, and other Marine Environmental Protection Requirements;
- describing system operation and procedures for usage of all associated bilge management equipment, the sealing and securing of associated valves, offloading procedures and necessary operational checklists;
- describing record keeping of ORB, including items to be recorded, as required by MARPOL, and record keeping requirements of additional logs described in the Engineering section of this ECP;
- describing sanctions and consequences for violation of regulations, policies and procedures, including individual and corporate

[2] The amendments below are for clarity, and do not substantively change the Government requirements.

consequences for violations, remedial training, possible suspension or termination of employment, and civil and criminal liability; and

- describing processes associated with the sealing and locking program for system crossover and connection valves where bilge systems tie into ballast, general service and other pumping or eductor systems, and the processes for sealing other identified connections and other systems capable of bilge removal with the use of the OWS.

**Sewage Treatment:**

- describing Avin's policy and procedures regarding management, disposal and discharges, including the identification of persons responsible for environmental compliance;
- describing applicable ECP and EMS requirements, domestic and international laws, regulations and standards, including applicable portions of the CFR, other pertinent pollution laws and regulations, MARPOL regulations, and standards;
- describing internal and external reporting requirements relating to discharges;
- describing general overview of system including the basic and general functions of sewage systems and equipment, including system schematics;
- describing fundamentals and maritime practices of sewage system management in accordance with the requirements of MARPOL 73/78 and the ECP;
- describing system operation and procedures including the standard operating procedures for usage of all sewage equipment and systems, and operational checklists;
- describing maintenance of sewage system equipment, including routine, daily and preventative maintenance, recordkeeping, and the identification and required inventory of critical spare parts; and
- describing sanctions and consequences for violation of regulations, policies and procedures, including individual and corporate consequences for violations, which may include remedial training, possible suspension or termination of employment, and civil and criminal liability.

**Hazardous and Solid Waste Management**

- describing Avin's policies and procedures regarding management, disposal, and discharge, including the identification of persons responsible for environmental compliance;

- describing applicable ECP requirements, domestic and international laws, regulations and standards, including applicable portions of the CFR, other pertinent pollution laws and regulations, and MARPOL regulations and standards;
- describing internal and external reporting requirements for tracking and disposal of covered wastes;
- describing systems used to control, treat and dispose of specific wastes, including system schematics, where appropriate;
- describing fundamentals and maritime practices of waste minimization that include discharge procedures in accordance with the requirements of MARPOL 73/78 and the ECP;
- describing the system operation and procedures, including standard operating procedures for usage of hazardous waste management systems, off-loading procedures, and operational checklists;
- describing procedures for completing required discharge receipts and other entries;
- describing routine, daily and preventative maintenance, record-keeping, and the identification and required inventory of critical spare parts; and
- describing sanctions and consequences for violation of regulations, policies and procedures, including individual and corporate consequences for violations, to include remedial training, possible suspension or termination of employment, and civil and criminal liability.

**Required Documentation and Reference Material:**

Requiring that the following documentation and reference material will be readily on board each Avin vessel:

- Regulatory References;
- System Schematics (where applicable);
- Tank Tables;
- Tank Arrangements;
- Holding Capacities;
- Critical Spare Parts List;
- MSDS for any chemicals or hazardous substances used in the Engine Room;
- List of Regulated Wastes;

- Discharge Restrictions List;
- Forms;
- List of Sealed Valves; and
- List of Locked valves.

## ATTACHMENT 5

**Reports and Notifications to be Provided to the Court Appointed Monitor**

1. Audit reports prepared by the TPA.

2. Reports of non-compliance received from employees and action taken by the CCM.

3. Quarterly reports made to the CEO concerning compliance with and implementation of this ECP, the EMS, and other Marine Environmental Protection Requirements.

4. Annual summaries of reports by the CCM to Avin , including issues of non-compliance and corrective action taken.

5. Reports of circumstances where the Avin fails to fully support and finance the implementation of the ECP and the EMS.

6. Reports of Analysis of representative oil samples.

7. Internal audit reports and supporting documents.